**CURTISS–WRIGHT CORPORATION, WRIGHT AERONAUTICAL DIVISION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 14739.

United States Court of Appeals
Third Circuit.

Argued Sept. 21, 1964.

Decided June 8, 1965.

James E. Fagan, Yauch & Fagan, Newark, N. J. (G. A. Froelich, Wood-Ridge, N. J., on the brief), for petitioner.

Melvin Welles, N. L. R. B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Melvin H. Reifin, Atty., N. L. R. B., on the brief), for respondent.

Joseph L. Rauh, Jr., John Silard, Stephen I. Schlossberg, Daniel H. Pollitt, George Kaufmann, Washington, D. C., for amicus curiae, UAW-AFL-CIO.

Before HASTIE and FORMAN, Circuit Judges, and KIRKPATRICK, District Judge.

FORMAN, Circuit Judge.

Curtiss-Wright Corporation, Wright Aeronautical Division, Wood-Ridge, New Jersey (hereinafter called Employer) has petitioned to set aside the Order of the National Labor Relations Board (hereinafter called Board) of August 7, 1963. The Board has filed a cross-petition to enforce the Order.

For a number of years International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (AFL-CIO), through its Local Union 300 (hereinafter together called Union) has been and is now the representative for purposes of collective bargaining of salaried office, clerical and engineering employees, exclusive of supervisory, confidential and administrative employees [1] at plants of the Employer in

---

1. Excluded employees pertinent to this litigation are defined in the labor contract between the Employer and the Union, dated October 9, 1962, as follows:

"(a)   *   *   *

"(b) Confidential employees, which term shall be deemed to mean employees whose work is regularly concerned with and who have access to information or records which relate di-

the vicinity of Paterson and Wood-Ridge, New Jersey.

The facts are not in dispute.[2] In 1957 the Union estimated that there were 4500 to 4700 employees in the bargaining unit which it represented. Those excluded numbered about 2100. Over the years the proportion changed until those excluded numbered more than those in the unit. The Union had become apprehensive for it believed that the change was caused in part at least by employees classified as administrative actually doing work which should have been allocated to those in the bargaining unit. With this situation in mind, in April 1962, the Union requested the Employer to furnish it with a summary of job classifications, and/or titles of confidential and administrative employees of the Employer; of job descriptions and of duties and functions of the total number of confidential and administrative employees in each such job classification and/or title, as well as the regular rates of pay, including the grade or range for each such classification or title.[3]

rectly to the problem of labor relations or knowledge of the same which would be advantageous to any union in its negotiations with the Company, and shall include, but shall not be limited to, Secretaries and Stenographers who work principally and directly for Executives, Staff Members, or Directors or Managers; employees in the Employee Relations Division; Job Analysts; and all employees who fix rates and pay for employees included in the bargaining unit.

"(c) Administrative employees, which term shall be deemed to mean employees who are compensated for services at a salary in accordance with existing law and (1) who regularly and directly assist employees employed in a bona fide executive or administrative capacity, where such assistance is nonmanual in nature and requires the exercise of discretion and independent judgment: or (2) who perform under only general supervision, responsible nonmanual office or field work, directly related to management policies or general business operations, along specialized or technical lines requiring special training, experience, or knowledge, and which requires the exercise of discretion and independent judgment; or (3) whose work involves the execution under only general supervision of special nonmanual assignments and tasks directly related to management policies or general business operation involving the exercise of discretion and independent judgment."

2. At the commencement of the hearing before the Trial Examiner in this case the parties entered into a stipulation in which they agreed upon the facts arising prior and subsequent to the filing of the amended complaint of November 20, 1962 substantially as set forth in the text of this opinion.

3. The request was incorporated in the following letter:

"April 2, 1962

"Mr. Kenneth P. Schmidt
Industrial Relations Manager
Wright Aeronautical Division
Curtiss Wright Corporation
Wood-Ridge, New Jersey

"Dear Mr. Schmidt:

"The International Union, UAW and its local Union No. 300 respectfully requests that the Company furnish it with the following information:

"1.—A summary of job classifications and/or titles of confidential and administrative employees at the Wright Aeronautical Division of the Curtiss Wright Corporation, Wood-Ridge, New Jersey.

"2.—A job description or summary of duties and functions for confidential and administrative employees at the Wright Aeronautical Division of the Curtiss Wright Corporation, Wood-Ridge, New Jersey.

"3.—A summary of the total number of confidential and administrative employees in each job classification and/or title at the Wright Aeronautical Division of the Curtiss Wright Corporation, Wood-Ridge, New Jersey.

"4.—The regular rate of pay, including the grade or range, for each confidential and/or administrative employee classification or title at the Wright Aeronautical Division of the Curtiss Wright Corporation, Wood-Ridge, N. J.

"As you know, the union and the company have been confronted with numerous problems involving the relationship of 'included' and 'excluded' employees at the company's New Jersey plants and the work and function performed by each. Many of these problems have failed at informal resolution and have culminated

The Employer responded to the April request of the Union on May 9, 1962 by advising that it had given close attention to the administrative and confidential positions excluded by the contract; that it was then reviewing them for corrections of exclusion and would continue such review in the future stating that any incorrect exclusions that were found would be communicated to the Union and corrections made. The Employer, however, declined to furnish the requested information on the ground that a compilation thereof would be in such volume as to be unduly burdensome and not pertinent to pending grievances, administration by the Union of the contract or for the purpose of future negotiations.

On June 18, 1962, the Union filed an unfair labor practice charge against the Employer, the basis of which was that it had refused to disclose a summary of job classifications, titles, job descriptions, rates of pay, hours, grades and ranges, and numbers of confidential and administrative employees, whereby it violated Section 8(a) (1) and (5) of the National Labor Relations Act (hereinafter called the Act).[4] This resulted in the issuance by the Board of a complaint on September 28, 1962, and an amended complaint on November 20, 1962.

The amended complaint alleged, among other things, that on or about April 2, 1962, September 10, 1962, and at various other times the Union had requested the Employer to furnish it with data heretofore set forth and that the Employer had failed and refused to comply with the request. The amended complaint claimed that the requested information was required by the Union to enable it to effectively police and administer the contract, to prepare it to process grievances and to bargain for a new contract intelligently.

Between the filing of the charges of June 18, 1962 and the date of the issuance of the amended complaint, November 20, 1962, negotiations had been proceeding between the Employer and the Union which resulted in the execution of a new three year contract on October 19, 1962 containing substantially the same provisions pertinent to the issues involved herein as were found in the preceding contract, which ran from its effective

---

in formal grievances which have been processed through various steps of the grievance procedure. Lack of relevant and material information concerning job functions, duties, hours, and rates of pay for excluded employees directly concerned with these disputes has severely handicapped the union in the administration of the collective bargaining agreement and processing of contractual grievances. Since the work of excluded confidential and administrative employees in many situations bears a close and substantial relationship to that performed by employees covered by the collective bargaining agreement, complete information concerning such excluded employees is essential for the union to discharge its obligations under the collective bargaining agreement and to intelligently administer that agreement.

"Moreover, the foregoing information is requested by the union for any collective bargaining that may ensue between the parties on the subject of work functions and duties for included and excluded employees at the company's New Jersey plants.

"We request that this information be furnished to us as soon as possible in a form that is convenient to the company. In the event you have any questions concerning our request, we will be glad to provide further details.

"Thank you for your cooperation in this matter.

"Very truly yours,
"E.S.E.A. LOCAL 300 U.A.W.
"Thomas Lazzio,
"President."

The request for the identical information was repeated in a letter between the same parties dated September 10, 1962.

4. 29 U.S.C. § 158(a) (1) and (5) (1959). These portions of the Act provide respectively:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"(5) to refuse to bargain collectively with the representative of his employees, subject to the provisions of section 159(a) of this title."

date, September 18, 1961 and expired September 30, 1962.

While the proceedings under the amended complaint were in process, but before hearing, the Employer addressed a letter dated December 14, 1962 to the Regional Director of the Board enclosing two copies of a list of the titles of the administrative jobs and the names of the individuals holding them. It expressed its understanding that one copy of the list would be forwarded to the Union. The submission was made by the Employer with the reservation that it neither be considered as a precedent nor as a waiver or abandonment of the Employer's rights or defenses.

On January 15, 1963, the Union narrowed the scope of its inquiry regarding the excluded personnel of the Employer and requested job descriptions and other summaries of duties performed under 80 specified job titles. Subsequent thereto the Employer met with the Union on several occasions to discuss the Union's inquiries concerning the job classifications cited in the Union's letter of January 15th. On these occasions the Employer disclosed the job descriptions, duties and functions of the job under discussion and arrived at some adjustments. Except in two specific instances, however, it declined to disclose the job evaluation factors.[5]

On February 21, 1963, the Union again addressed the Employer asking for certain other information including the wage rates, and economic benefits other than wages received for each job classification or title. On March 12, 1963, the Union made an oral request to the Employer for a list of job evaluation factors for job classifications in addition to the job descriptions previously requested.

The controversy based on the November 20, 1962 amended complaint went to hearing before a Trial Examiner of the Board on July 8, 1963. After taking evidence he rendered his Intermediate Report [6] in which he concluded that the amended complaint could not be sustained in so far as it rested on the request of the Union for data concerning confidential employees. The Trial Examiner found that the record did not reflect that the Union had good cause to suspect misclassification of confidential employees and, therefore, part of the requested data had not been shown to have been reasonably relevant to the Union's role as bargaining representative. The Trial Examiner further found that the Union's "general shotgun" request, as he phrased it, in its letters of April 2 and September 10, 1962 was inappropriate because the facts known to the Union would have enabled it to have made more limited and specific requests.

He concluded, however, that by withholding certain specific data requested by the Union subsequent to the filing of the amended complaint of November 20, 1962 with respect to the job evaluation factors and wage rates for specific administrative jobs the Employer had committed

---

5. In his Intermediate Report, note 6 infra, the Trial Examiner accurately described the job evaluation factors thus:

"* * * The 'job evaluation factors' are a part of the total 'job description' sheet which the Company prepares for each job in a bargaining unit and also for a number of administrative jobs outside the unit. Each of those sheets contains on one side a narrative description of the duties and functions of the particular job. The reverse side is a printed form listing 11 'job factors,' and blank spaces opposite each for filling in the appropriate 'degree' and the 'basis of rating.' The sum of 11 'degrees' [3] gives the total rating of the job, which in turn determines the wage. The 'basis of rating' on each factor is a sentence or two explaining the degree assigned. The 11 factors are 'scholastic requirements,' 'previously related experience,' 'qualifying period,' 'scope of duties,' 'initiative exercised,' 'frequence of verification,' 'contacts required,' 'degree of concentration,' 'working conditions,' 'number directed,' and 'supervisory responsibility.'

"3 Actually, the degree is a letter ranging from A to F, but each letter for a particular factor represents a certain number."

6. 145 N.L.R.B. 152 (1963).

an unfair labor practice affecting commerce within the meaning of Section 2(6) and (7) [7] and Section 8(a) (1) and (5) [8] of the National Labor Relations Act.[9]

The Employer thereupon filed with the Board its exceptions to the Intermediate Report and Recommended Order of the Trial Examiner together with arguments and authorities in support of said exceptions. The Union did not except to rulings adverse to it. A panel of the Board filed its decision in which it stated that it had considered the Intermediate Report of the Trial Examiner, the exceptions, briefs and the entire record in the case. On review of the rulings of the Trial Examiner it found that no prejudicial error was committed and adopted the findings, conclusions and recommendations of the Trial Examiner. The Board adopted the Recommended Order of the Trial Examiner as its Order. Thereupon the Employer sought this review of the Board's Order contending that the amended complaint should be set aside for reasons much the same as those advanced in the exceptions to the Intermediate Report of the Trial Examiner. The Board opposes such action and requests enforcement of its Order.

— I —

The Employer contends that the Trial Examiner disregarded entirely the evidence of its willingness to actually meet and confer as reflected in the regular Employer-Union meetings which were productive of the transfer of some employees formerly classified as administrative to the bargaining unit. Therefore, submits the Employer, the Trial Examiner has made no finding which could support a Section 8(a) (5) [10] violation of refusing to "meet" or to "confer in good faith" as the term "collective bargaining" is defined in Section 8(d) of the Act.[11]

Furthermore, according to the Employer, the Trial Examiner concerned himself only with whether the requested data was relevant to the needs of the Union functioning as bargaining agent, and finding it relevant, erroneously concluded that Employer failure to disclose that which was requested constituted a per se violation of Section 8(a) (5) of the Act. Such a determination of relevancy, even if well founded, is merely a preliminary step, asserts the Employer, the duty of the Trial Examiner being to inquire whether the failure to supply relevant information *under all the circumstances of the case,* constitutes a refusal to meet and confer in good faith.[12] To buttress this approach, the Employer also embarked on an elaborate analysis of many cases for the purpose of demonstrating the elements which must be shown before it could be found to have committed an unfair labor practice under the test which

7. 29 U.S.C. § 152(6) and (7) (1959).

8. 29 U.S.C. § 158(a) (1) and (5) (1959).

9. Accordingly the Trial Examiner recommended that the Employer:
   "1. Cease and desist from refusing to furnish International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), AFL–CIO, and its Local Union No. 300, with the job evaluation factors and with the wage rates, grades, and ranges, and other economic benefits of particular administrative employees, when requested to do so by said organization.
   "2. Take the following affirmative action necessary to effectuate the policies of the Act:
   "Upon request of the above-named labor organization, furnish it with respect to the particular administrative employees or jobs as to whom the request is made with the names or number of employees in each requested job classification or title, and with other relevant data pertaining to the classification of the job or jobs in question as 'administrative,' including such matters as the job description, the job evaluation factors, and the wage rate, grade, and range, and other economic benefits pertaining to the job or jobs."

10. 29 U.S.C. § 158(a) (5) (1959).

11. 29 U.S.C. § 158(d) (1959).

12. As authority, the Employer cited National Labor Relations Board v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); Pine Industrial Relations Committee Inc., 118 N.L.R.B. 1055, aff'd sub nom., Int. Woodworkers of America v. N.L.R.B., 105 U.S.App.D.C. 37, 263 F.2d 483 (1959).

68

it conceives to be appropriate. Emphasis is sought to be laid on not only the relevancy of the requested data, but also on the *necessity* of the requested data for bargaining on a *mandatory subject* pertaining to employees *in the unit represented by the Union*. The *confidential nature* of the requested data and the presence of *grievance machinery* to deal with problems of misclassification are also circumstances the Employer feels must be weighed.

Thus, as the Employer conceives the legal standard by which the Board must judge whether an employer unfair labor practice has been committed, there must have been a bad faith refusal to actually sit down at the bargaining table to avoid meeting and conferring on a non-confidential matter which is both relevant and necessary to a mandatory bargaining subject, a matter which relates to employees within the Union's bargaining unit, and which matter may not be broached through other avenues such as grievance machinery.

■ The Board takes the position that development of the law regarding employer disclosure of wage and related information requested in good faith by a union has taken a course considerably broader than that which the Employer here conceives. It holds the proper rule to be that if the requested data is relevant and, therefore reasonably necessary, to a union's role as bargaining agent in the administration of a collective bargaining agreement, it is an unfair labor practice within the meaning of Section 8(a) (5) of the Act for an employer to refuse to furnish the requested data.[13] With that conception of an employer's duty to bargain this court is in agreement.

■ The Employer views its duty to bargain collectively as merely a good faith meeting and conferring with the Union. Though recognizing the well settled obligation of the bargaining agent not only to negotiate new contracts but also to police and administer existing agreements, the Employer assumes a position which would define the obligation of the bargaining agent and employer in a manner which would make collective bargaining an ineffective method of attaining industrial stability, the chief aim of Congress in its passage of major labor legislation. Without the disclosure of relevant information both contract negotiations and the institution of grievance and arbitration procedures under existing agreements would be hampered. Merely meeting and conferring without a prior exchange of requested data, where such is relevant, does not facilitate *effective* collective bargaining and, therefore, does not meet the requirements of Section 8 (a) (1) and (5). Because of the need to facilitate effective collective bargaining, a refusal to furnish data is an unfair labor practice notwithstanding the good faith of an employer in rejecting the request. This has been the declared policy of many of the circuit courts.[14]

■ The Employer goes to great lengths both to emphasize the necessity to look at all the circumstances of the case and to attack the Board's legal conclusion that once the requested data is demonstrated to be relevant to a union functioning as bargaining agent, an employer's refusal to turn over the information is per se an unfair labor practice. The Employer's mistaken view of the law relating to its duty to bargain is bared by its citation of Int. Woodworkers of America v. N. L. R. B.[15] as holding unequivocally that information *not* relating

13. The Union, which appears in this case as amicus curiae, takes substantially the same position.

14. See Boston Herald-Trav. Corp. v. N.L.R.B., 223 F.2d 58 (1 Cir. 1955) where a thorough analysis of earlier cases is made. See also these later cases: Timken Roller Bearing Co. v. N.L.R.B., 325 F.2d 746 (6 Cir. 1963), cert. denied, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964); J. I. Case Co. v. N.L.R.B., 253 F.2d 149 (7 Cir. 1958); Taylor Forge & Pipe Works v. N.L.R.B., 234 F.2d 227 (7 Cir. 1956).

15. Supra note 12.

directly to *wages* of unit employees need not be produced merely because it is relevant. In reality, Woodworkers follows Boston Herald-Trav. Corp. v. N. L. R. B.[16] and stands for the following proposition of law: *wage and related information* pertaining to employees in the bargaining unit is *presumptively* relevant, for, as such data concerns the core of the employer-employee relationship, a union is not required to show the precise relevance of it, unless effective employer rebuttal comes forth; as to other requested data, however, such as employer profits and production figures, a union must, by reference to the circumstances of the case, as an initial matter, demonstrate more precisely the relevance of the data it desires. Thus, the standard, relevancy of the data, is the same for all cases, but the manner in which a union can demonstrate that its requests conform to the standard shift with the type of information desired.

■ Once relevance is determined, an employer's refusal to honor a request is a per se violation of the Act. Reasonable necessity for a union to have relevant data is apparent; necessity is not a separate and unique guideline, but is directly related to the relevance of the requested data.

■ We fail to see, as argued by the Employer, that this legal standard applied by the Trial Examiner is inconsistent with National Labor Relations Board v. Truitt Mfg. Co.[17] In Truitt the dispute revolved around a demand for a pay increase. The employer, itself, claimed that it could not afford to meet the demand and that, if it did, it would put itself out of business. The union requested evidence of the employer's financial status to support its claim of financial difficulty. The union insisted that the information was essential and pertinent for the employees to determine whether they should persist in their demand. The employer refused all requests merely on the assertion, without more, that the information requested was not pertinent to the wage discussion

and thus, the union had no legal right to it. The Supreme Court upheld the Board's conclusion that under all the facts and circumstances the employer had failed to bargain in good faith in violation of Section 8(a) (5) of the Act. It is clear that usually a union's request for data concerning an employer's financial status must be supported with sufficient circumstances to demonstrate relevance. In Truitt, the employer's claim that it was financially unsound and could not grant a wage increase because of its financial status, together with its inability to defend its refusal, established the relevance of the union's request. Truitt is, therefore, quite consistent with the legal standard accepted and applied in the instant case.

■ The Employer seeks also to show that even if a proper legal standard were applied by the Trial Examiner and the Board, the facts of this case negate the relevance of the requested data. The Board agreed with the Trial Examiner that because the requested data concerned employees classified outside the bargaining unit, a presumption of relevance could not attach to the requested data, and that for the Union to be entitled to the data it sought, it must demonstrate relevance unaided by a presumption. Although it may be argued that information which would shed light on whether the integrity of a bargaining unit, itself, was being eroded by an employer is presumptively relevant, we need not reach that question for, as the Trial Examiner found, the Union has successfully demonstrated the relevance of the data it requested.

The Trial Examiner took into consideration such circumstances as the dwindling proportion of bargaining unit employees to administrative employees, union observations of probable misclassifications, and the utility of information afforded in the job evaluation factors, wage rates and other benefits as an aid in determining the proper classification of the administrative group. Such a determination would act as a guide to the Union

---

16. Supra note 14.

17. Supra note 12.

both as to better provisions in those respects that it could reasonably seek at the bargaining table and as to relief it could seek through the effective prosecution of grievances. The Trial Examiner also found that changes were actually made in the composition of the bargaining unit following the production of data by the Employer which led him to the conclusion that such information was relevant to the Union's duty both to negotiate a contract and administer one.[18]

The Employer, on the other hand, contests the efficacy of the data as having been productive of any such result. It attributes the changes made to its own good faith in checking the status of the given employees and meeting with the Union in relation thereto. Be this as it may, it does not detract from the potential value of such material as pertinent data with which the Union should be supplied in order to assist it in its task of deciding whether to institute grievance proceedings or use other policing tools under the existing bargaining agreement and to guide the Union in contract negotiations themselves. In this latter connection, the Employer has stressed the lack of value of the withheld material because a negotiation process culminated in a new three year contract during the very period of the pendency of the amended complaint in this case. We accord this argument little merit for the requested information has shown potential utility notwithstanding that in this instance circumstances apparently dictated the continuation of the contractual relationship between the Union and the Employer on much the same terms and conditions as before, without the interposition of the requested data.[19]

■ The Employer also emphasizes that an element prerequisite to a union's legal right to receive requested data is that such data be directly related to employees within the bargaining unit itself. Such an argument was properly rejected in Hollywood Brands, Inc.[20] In Hollywood Brands the employer had indicated that its policy was to keep its employees in all its plants at the same wage level. The union requested payroll data as to existing wages in one of the employer's plants which was outside the bargaining unit. The employer refused to divulge such information. The Board found that such payroll records were relevant and that the employer's refusal to allow union inspection was a violation of Section 8(a)(5). It is well within the responsibility of the Union in the instant case in executing its duty to protect the interests of the employees in the bargaining unit it represents to closely scrutinize all facets relating to any encroachment upon the rights of those unit employees to the end that a stable employment structure for the members of the bargaining unit may be maintained. A misclassification of an employee to the excluded group instead of to the bargaining unit is such an encroachment and the Union was fully warranted in any reasonable probing of the data concerning the excluded employees to assure the classification of employees in the appropriate groups pursuant to the bargaining agreement.

■ While it is true, as the Employer contends, that bargaining as to employees

18. In this connection the Trial Examiner stated:
"* * * With respect to such employees, however, the record shows that the Union had good cause to believe that certain misclassifications had occurred, and, indeed, as a result of the information eventually furnished by the Company (after issuance of the complaint, and coupled with a contention, since repeated, that the Company had no legal obligation to furnish the data) several changes were made in the composition of the bargaining unit. It seems clear to me that where

the production of such data accomplishes such results, the Union has shown that the material was relevant to its discharge of its obligation to represent the employees." 145 N.L.R.B. 152, 157 (1963).

19. See N.L.R.B. v. Yawman & Erbe Mfg. Co., 187 F.2d 947, 949 (2 Cir. 1951).

20. 142 N.L.R.B. 304, enforced, Hollywood Brands v. N.L.R.B., 324 F.2d 956 (5 Cir. 1963), rehearing denied, 5 Cir., 326 F.2d 400, cert. denied, 377 U.S. 923, 84 S.Ct. 1221, 12 L.Ed.2d 215 (1964).

classified as administrative is not mandatory, for they are not in the bargaining unit,[21] it does not follow that the Employer is not required to divulge information with respect to such employees. Because such information was shown to be relevant to the determination of the status of employees as unit employees and thus to a mandatory subject of bargaining, the Employer's position is of no merit.

The Employer claims it was not required to divulge what it considered to be confidential data. Though admitting that there are several cases in which it has been held that an employer may not rely upon the defense of "confidential information," the Employer asserts that the requested data in those cases related directly to unit employees. Be that as it may, as we have indicated above, the relevance of the data requested in the instant case to appropriate representation of unit employees themselves was so well established that confidentiality cannot serve as a shield to protect the Employer from the consequences of its refusal to divulge this relevant data.

We also cannot accept the Employer's argument that the proper forum for the resolution of the issue of whether the requested data is relevant is through the grievance machinery. When read together, Sinclair Refining Co. v. N. L. R. B.[22] and Timken Roller Bearing Co. v. N. L. R. B.[23] demonstrate that only when the demand for information itself is contractually subject to the grievance procedure as the method of union data accumulation will that procedure be exclusive. Collective bargaining agreements normally call for the submission of complaints and grievances to procedures of grievance and arbitration. Demands for information are usual precursors to the submission of complaints and grievances to grievance and arbitration

machinery. This is only natural, for as the Trial Examiner pointed out, unions would be forced to grope blindly through the very stages of the grievance procedure unless adequate information were preliminarily available. Thus, unless the collective bargaining agreement both contains a broad disclosure provision and the grievance and arbitration provisions are also couched most broadly, clearly indicating that demands for information are to be made through the grievance and arbitration machinery, the existence of such machinery is no defense to an employer who has refused to supply relevant data upon a union request.

The contract in the instant case contains neither of these broad provisions. The general grievance procedure, job evaluation grievance procedure, and job classification grievance procedure, as laid out in the contract, provide methods merely to deal with existing problems relating to individual employees. Article 38 of the contract indicates that the general grievance procedure could be appropriately used to handle all other *grievances* arising out of the terms of the contract, but this reference to grievances, when taken in context, would seem to indicate specific problems concerning individual unit employees. Thus, contrary the view of the Employer, this Article does not appear broad enough to require submission of the general question of the relevance of the requested data through the grievance machinery. Even if it were to be read more broadly than we see fit to do, there is no appropriate article in the contract which indicates a grievance could even be based on a demand for information. Even though Articles 83–86 deal with job re-evaluation, the crux of the potential grievances in this case, Article 86 indicates that grievance machinery is to be

---

21. There may be exceptions to this general rule. See Local 24 of International Brotherhood of Teamsters, etc., v. Oliver, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959), where the working conditions of non-unit employees were included within the scope of mandatory bargaining because of the potential effect the non-union employees working conditions might have on unionized jobs.

22. 306 F.2d 569 (5 Cir. 1962).

23. Supra note 14.

used to review job re-evaluation on a job by job, objection by objection, basis. The agreement is silent as to a broad right of disclosure which in turn might be subject exclusively to the grievance machinery and arbitration by way of Article 38 of the contract. In this respect our case falls within Timken. Therefore, as the right to the requested data stems from the Act in the instant case, rather than from the collective bargaining agreement, the Employer cannot demand that the Union use the grievance machinery as its method of data accumulation.

— II —

Finally, the Employer alleged it was deprived of due process of law in that it was found to have committed an unfair labor practice on the basis of facts which occurred subsequent to the filing of the amended complaint. The importance of this issue has been magnified by the Trial Examiner's finding that the events occurring before the filing of the amended complaint do not constitute an Employer unfair labor practice, while those arising after the filing do constitute an Employer unfair labor practice.

■■■■■■ The propriety of a pleading is today judged by its effectiveness as a mechanism for giving an adverse party notice of the claim upon which relief is sought. "All that is requisite in a valid complaint before the Board is that there be a plain statement of the things claimed to constitute an unfair labor practice that respondent may be put upon his defense." [24] Such a complaint need state only the manner by which the unfair labor practice has been or is being committed,[25] the absence of specifics being tolerated when there has been no special showing of detriment.[26] The amended complaint here involved states the following:

"13. On or about April 2, 1962, and on September 10, 1962, and at various other times, the Union has requested Respondent to furnish it with data relating to job classifications, titles, job descriptions, duties and functions of Respondent's employees at its Wood-Ridge plant presently classified by Respondent as confidential and administrative employees, together with the number of employees in such classifications and their respective wage rates, grades and ranges, and related matters.

"14. On or about April 2, 1962, and on September 10, 1962, and at all times since said dates, Respondent has failed and refused, and continues to fail and refuse, to furnish the Union any of the requested data described above in paragraph 13, or any other relevant and material information in lieu thereof."

The record discloses that similar information was requested subsequent to the filing of the amended complaint, Employer refusals to honor these requests alone being ruled unfair labor practices. The Trial Examiner did not distingish pre-filing fair Employer practices from post-filing unfair Employer practices on the ground that the substance of the requests varied. The form of the Union requests served as the basis for distinction, Employer refusals to honor pre-filing "shot gun" requests being found acceptable, but refusals to answer more specific and quantitatively limited requests being determined to have been unfair labor practices. Thus, it is clear both that the Employer was on notice of the nature of the charge against it, the framing of the issue in the amended complaint being sufficiently informative, and that the post-filing facts did not create a new cause of action outside the purview of the amended complaint. The amended complaint was, therefore, sufficient to give the requisite notice to the Employer, further details only being left for the proofs.

24. American Newspaper Pub. Ass'n v. N.L. R.B., 193 F.2d 782, 800 (7 Cir. 1951).

25. N.L.R.B. v. Pacific Gas & Electric Co., 118 F.2d 780, 788 (9 Cir. 1941).

26. N.L.R.B. v. S. W. Evans & Son, 181 F.2d 427, 431 (3 Cir. 1950).

Even assuming arguendo that the amended complaint, itself, at the time of its filing, could not have notified the Employer of the nature of the charge based on post-filing facts, the record clearly indicates that the Employer should have recognized that its post-filing refusals to honor Union requests were in issue. Any possibility of doubt as to the contentions of the Union was removed in the course of the hearing.[27] We find that the legal effect of the post-filing Employer activities was in fact litigated befor the Trial Examiner. Almost all the evidence in the case related to the Employer's refusal to honor requests made subsequent to the filing of the amended complaint. Such facts were not introduced merely as background information. Counsel for the Board pointed out that the stipulation noted at the outset of this opinion was entered into in part to cover certain changes which had taken place in the allegations set forth in paragraphs 13 and 14 of the amended complaint quoted above. No objection was made by the Employer as to the effect of the stipulation, no claim of surprise was made, and no request for a continuance came forth.[28] The amended complaint was in effect amended again by the stipulation. Even if such stipulation were not to be considered an effective amendment:

> " * * * It is the practice to allow the General Counsel considerable leeway in amplifying or expanding certain details not specifically set forth in the complaint if they accord with the general substance of the complaint. As long as those details are fully litigated and offer no element of surprise to the Respondent, they are usually held to be a proper basis for an unfair labor practice finding. [Only] * * * when the

General Counsel attempts to prove, or the Trial Examiner makes a finding of an entirely new cause of action or violation not covered in the complaint, the Board has rejected such offer of proof or findings."[29]

The Employer, however, points out that the Trial Examiner, himself, stated that the issues are to be framed by the complaint, not by the introduction of certain evidence or by a stipulation. Apart from the fact both that the Trial Examiner's statement was made within a context quite distinct from the issue here involved and that the statement is, of course, subject to the legal exceptions noted above, it is our view, as it has been from the outset, that the amended complaint, without more, gave the Employer adequate notice of the gravamen of the issue to be litigated, only the details being wanting.

The Employer's position then falls far short of a due process argument, namely, because the amended complaint was never itself formally amended, it may not serve as a basis for a finding of an unfair labor practice based on facts arising subsequent to its being filed. This mechanistic approach to the problem overlooks the point that "the question on review is not the adequacy of the * * * pleading but is the fairness of the whole procedure."[30] Absent particularity of pleadings, the conduct of a party may readily be tantamount to a submission to adjudication and, especially in an administrative proceeding, such adjudication may be based on facts arising subsequent, as well as prior, to the filing of those pleadings. Although it may be desirable to formally conform the proof to the pleadings, in the light of the above considerations we do not feel it necessary

27. See, e.g., Northwestern Bell Tel. Co. v. Nebraska State Ry. Comm., 297 U.S. 471, 476, 56 S.Ct. 536, 80 L.Ed. 810 (1936); American Newspaper Pub. Ass'n v. N.L. R.B., supra note 24, 193 F.2d at 799.

28. N.L.R.B. v. Yale & Towne Mfg. Co., 114 F.2d 376, 379 (2 Cir. 1940); Local 138, Int'l Union of Operating Engineers, 123 N.L.R.B. 1393, 1396 n. 8 (1959).

29. Stokely-Bordo Co., 130 N.L.R.B. 869, 872–73 (1961). See N.L.R.B. v. Puerto Rico Rayon Mills, Inc., 293 F.2d 941, 947–948 (1 Cir. 1961); N.L.R.B. v. H. E. Fletcher Co., 298 F.2d 594, 600 (1 Cir. 1962).

30. 1 Davis, Administrative Law § 8.04 at 525 (1958).

to rule that such failure should here affect the administrative disposition of the substantive issues.[31] We thus see no merit to the Employer's position that facts arising subsequent to the filing of the amended complaint may not here serve as a basis for the determination of an unfair labor practice.

Having ruled on all the questions of law in the aforementioned manner and having found that there was substantial evidence in the record to support the findings of the Board, the Order of the Board will be enforced.

31. Compare Fed.Rule Civ.Proc. 15(b).