GENERAL ELECTRIC CO., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Intervenor International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC and its Local 705, (two cases).

GENERAL ELECTRIC CO., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Intervenor International Union of Electrical Radio and Machine Workers, AFL–CIO–CLC, (five cases).

INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO–CLC, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

Intervenor General Electric Co.

Nos. 71–1404, 71–1405, 71–1406, 71–1643 and 71–1885.

United States Court of Appeals, Sixth Circuit.

Sept. 15, 1972.

J. Mack Swigert, Cincinnati, Ohio, for petitioner; Thorley C. Mills, Thomas F. Hilbert Jr., New York City, Charles T. Hall, Cleveland, Ohio, Taft, Stettinius & Hollister, Cincinnati, Ohio, on brief.

Ira Goldberg, for respondent; Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas E. Silfen, National Labor Relations Board, Washington, D. C., on brief.

Irving Abramson, Washington, D. C., for intervenor; Ruth Weyand, Winn Newman, Washington, D. C., Robert Friedman, New York City, on brief.

Before PECK, MILLER and KENT, Circuit Judges.

JOHN W. PECK, Circuit Judge.

The General Electric Company has petitioned this Court to review and set aside orders of the National Labor Relations Board (hereinafter "Board") adverse to the Company in five cases, each of which raises the same basic issue for appellate review. The issue we are required to decide is whether the Board correctly ruled in these cases that General Electric violated Section 8(a)(5) and (1) of the National Labor Relations Act by refusing to furnish the Union [1] with certain correlated wage data which General Electric had obtained as the result of area wage surveys taken at four of its plant locations. The Board has cross-petitioned for enforcement of its orders herein.

Although each of the five cases differs somewhat in its factual background, there are certain facts common to all which may be preliminarily set out. General Electric and the Union had in effect at the time of the instant disputes

[1]. The Union in this case is the International Union of Electrical Radio and Machine Workers, AFL–CIO–CLC, and its Locals at the plants involved in this proceeding. The Union has participated herein as an intervenor.

a National Collective Bargaining Agreement[2] covering the employees at its various plant locations. The following provisions were included in the Agreement under Article VI:

"1. Any question which affects hourly rates, piece-work rates or salary rates of individuals or groups shall be subject to negotiation between the Local and local management.

\* \* \* \* \* \*

"5. The Union and the Locals recognize that starting rates and job rates for hourly rated and salaried employees vary, depending on the job, its location and its surrounding circumstances."

It is thus the clear intention of the parties that questions affecting wage rates of individual employees or groups of employees are under the above agreement to be submitted to negotiations at the plant levels between the local unions and local management. General Electric's objective as found by the Board in this regard is to establish wage rates at its separate plants which are competitive in the local labor markets in order to insure that General Electric hires and retains its proportionate share of qualified and competent employees.

At the four plant locations, namely Dover, Ohio; Rome, Georgia; Seattle, Washington; and Fitchburg, Massachusetts, the Company had for a number of years conducted wage surveys of other area employers to determine what employees performing comparable work in these areas were being paid. These surveys were generally kept by the Company for its own use and the Unions were denied the opportunity of fully examining the data during grievance proceedings or during collective bargaining negotiations over wages. In the years 1967 to 1969, the Union began pressing for full disclosure of this survey data. The Company generally agreed to disclosure of the uncorrelated portion of the survey data, but refused to make the correlated data available to the Union.[3] It is this refusal and the Company's denial that it was obligated to furnish to the Union any survey data at all at two of the plants (Seattle and Fitchburg) which is the crux of the controversies.

We turn now to a brief recitation of the facts on a plant-by-plant basis which are necessary to the conclusions which we hereinafter reach.

I

*Dover, Ohio*

At Dover, Ohio, General Electric is engaged in the manufacture of molybdenum and fabricated molybdenum parts for lamps and electronics industries. The Union represents the approximately 180 employees in production and maintenance work at the plant. In September, 1968, the Union filed a grievance with General Electric in which it protested "the improper wages paid by the Company to the area wages," and requested the Company to make an area wage survey and to supply the material to the Union. General Electric refused to make the survey, contending that there was nothing wrong with its wages. The Company noted that it had an ample amount of job applications at the plant and depended upon its general knowledge of the Dover community in backing its claim.

The Union then made its own survey, which indicated that General Electric was competitive in the skilled job classifications, but was not competitive in the middle and bottom classifications. Responding to this, the Company made its

2. There were a series of National Agreements in effect between the Union and Company, but only one of them is relevant to this action.

3. The term "correlated wage data" for purposes of this appeal refers to that information which links the identities of the employers surveyed to the specific wage figures shown in the wage surveys. In other words, the Union wants to know which figures pertain to which companies on a job by job basis. The uncorrelated data does not show this.

own survey of the pay scale in the area, and supplied the Union with most of the information gathered "including the names of the companies surveyed, the high and low average for each job for all companies surveyed, the high and low average for each job, the average at [the General Electric Dover] plant, the total number of light assembly employees surveyed, . . . and a list of the individual averages for the plants surveyed, *but refused to correlate the average with the plant it applied to on the ground that the information was obtained in confidence.*"

The Trial Examiner found that the correlation sought by the Union was not relevant or necessary to the Union's processing of its grievance. The Board reversed, and found that General Electric had relied upon the wage survey as one of its bases for denying the Union's grievance, that the correlation was relevant to the assessment of this information, and that confidentiality of the data does not bar the Union's right to it under these circumstances.[4]

## II

### *Rome, Georgia*

General Electric manufactures and sells medium transformers and related electrical products at its Rome, Georgia, facility. In 1967 and 1968, the Union filed several grievances with the Company for plant-wide wage increases. The grievances were denied after exhaustion of the third step of the grievance procedure.

From January to May, 1968, the Union called a series of "quickie" strikes, which were halted when General Electric offered to conduct a "community survey . . . in accordance with our usual practice," as part of a proposed settlement of the dispute. Under its usual practice at Rome, the Company first an-

alyzes what types of jobs and what companies in the area should be surveyed, and then it sends a wage analyst to the area employers to exchange and gather pertinent wage rate information. In each instance, General Electric agrees to keep the information confidential.

The Company used these surveys in determining what wage rates were necessary to maintain its competitive position in the Rome labor market. General Electric made up a list of the 11 companies surveyed and a chart showing the jobs surveyed with the highest and lowest rates in each job classification, the community's average rate in each classification and the average rates in the Rome plant. Again, however, the information failed to link the individual companies with the wage rates and job classifications. The Union was supplied with the uncorrelated data but claimed that the data did not agree with a survey the Union had taken. When the Union asked for the correlation in order to evaluate the data, the Company refused stating in a letter, "* * * [if the Company] were to violate the confidence of the area employers who contributed to the survey they could, with good reason, decide not to give us survey information in the future. *That would make it extremely difficult and perhaps impossible to obtain the best measurement of the wages of our employees against the Rome community and then to make appropriate pay changes.* I feel sure that, in the circumstances, you would not want to put the Company in that position." (Emphasis supplied.)

The Trial Examiner in this case found that the correlated data was relevant and necessary in order for the Union to bargain intelligently, but that this information need not be produced because it had been given to General Electric in confidence. The Board reversed the Trial Examiner and entered an order requiring disclosure.[5]

---

4. The Board's decision is reported at 188 NLRB No. 105.

5. The Board's decision is reported at 184 NLRB No. 45, as supplemented at 188 NLRB No. 106.

## III

### Seattle, Washington

General Electric operates an Apparatus Service Shop and Aircraft Service Shop in Seattle, consisting of approximately 100 production and maintenance employees. The 15 machinists in the Aircraft Service Shop became dissatisfied with their wage rates compared to the rates of machinists doing comparable work in the area. At a meeting of the machinists called by General Electric, the shop manager announced that an area wage survey had been conducted which indicated that their wages were below the scale and that a retroactive raise would be forthcoming as a result of the survey. However, no increase in wages was made. Six months later, the shop manager informed the Union that a second survey had been conducted. Upon the Union's request for a copy of the survey, the Company replied, "We have never used wage survey data to defend or support our rates of pay. Therefore, the request is denied." The Union then filed a formal grievance requesting that the Company be required to furnish the survey information.

The Trial Examiner and the Board found that the requested survey information was relevant and necessary for the Union's proper performance of its representative duties. They concluded that even though the parties were neither engaged in processing a wage grievance nor bargaining over local wages during the period of the Company's refusal to supply the data, such grievances were forestalled only because General Electric stated its awareness of an inequitable wage situation followed by predictions of pending wage increases, thereby lulling the Union into a "false sense of security." The Board held that under such circumstances full disclosure of the data was required by the Act.[6]

## IV

### Fitchburg, Massachusetts

General Electric manufactures electrical equipment at its Fitchburg plant. In May, 1967, the Union filed approximately 100 wage grievances at Fitchburg, and requested that certain job rates be increased "because of added skills and responsibility," and because the present rates were below the standard in the community. The Company negotiator during the grievance discussions, James E. Corzine, responded that he had "looked into the grievances * * * considered them as a group and our rate structure was proper." He maintained that the Company relied upon its success in the labor market in setting wage rates and that it was continuing to attract and retain qualified people. While the grievances were pending, the Company conducted two wage surveys in the Fitchburg area, one in 1968 and another in 1969.

When the Union asked General Electric to make the (1969) survey available to the Union, Corzine replied that the survey had been taken solely at the request of the Company's national headquarters for purposes of national negotiations and that it was in no way connected to the Company's position on the grievances. Eventually, the Company did furnish the Union uncorrelated data from the survey. However, Corzine admitted before the Trial Examiner that he had consciously avoided any mention of the wage survey in connection with the grievances in order to avoid having to disclose the confidential information contained therein, in the event the survey became an issue. At one point in his testimony, Corzine acknowledged that had the survey shown the Company's job rates to be comparatively low "We would have adjusted our structure, but we probably would have run a more detailed survey to check up on it."

The Trial Examiner credited Corzine's testimony where it was in conflict with

6. The Board's decision is reported at 188 NLRB No. 107.

that of a Union Official and found that wage grievances were not causally related to the Company's conduct of the wage survey and that the Company did not rely upon the survey when it denied the grievances. Failing to find such reliance, the Trial Examiner concluded that the Company did not violate the Act in refusing to supply the correlated data.

The Board disagreed with the Trial Examiner on the question of reliance. The Board cited Corzine's testimony where he said the Company "considered [the grievances] as a group and our rate structure was proper," and stated that this could only be interpreted to mean that the Company considered its rates to be in line with the wage structure in the Fitchburg area. The Board concluded that the Company must have taken into account the area wage survey in order to reach the foregoing position. The Board then said:

> "Our decision is bottomed on our conclusion that there was *inherent reliance* by the Company upon the wage surveys in its possession as evidenced by the Company's testimony that wage surveys are used to evaluate the Company's wage structure and to determine if that wage structure is proper and effective for the purpose of attracting and retaining employees from within its competitive wage area. In other words, the rate structure from the highest to the lowest must be competitive if it is to be characterized as the Company does as 'proper.' We conclude, therefore, that the Union has a right to correlated area survey data in order to properly perform its function as collective-bargaining representative." (Emphasis supplied.)

In light of the above reasoning, the Board determined that General Electric violated Section 8(a)(5) and (1) of the Act by refusing to furnish the correlated data to the Union.[7]

## V

### *General Electric's Obligation to Supply Uncorrelated Wage Data*

In the Dover and Rome cases, the Company voluntarily supplied the general results of the surveys to the Union and therefore the principal issue in those cases is whether furnishing of the correlated data was required. In Fitchburg, the Company similarly supplied the uncorrelated results of the survey, but contends that it was not obligated to do so under the Act. In Seattle, the Company refused altogether to supply any survey results. Thus, the initial question to be answered herein is whether General Electric was required to provide the Union with the results of the surveys in Fitchburg and Seattle. We hold that it was.

This Court has previously stated that "the Board's only function in such situation is in 'acting upon the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities.' " N.L.R.B. v. Rockwell-Standard Corp., Trans. & Axle Div., 410 F.2d 953, 957 (6th Cir.1969) quoting from N.L.R.B. v. Acme Industrial Co., 385 U.S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). This rule and part of the rationale behind it has been stated by Judge Foreman in the Third Circuit as follows:

> " * * * if the requested data is relevant and, therefore reasonably necessary, to a union's role as bargaining agent in the administration of a collective bargaining agreement, it is an unfair labor practice within the meaning of Section 8(a)(5) of the Act for an employer to refuse to furnish the requested data.
>
> * * * * * *
>
> "Without the disclosure of relevant information both contract negotiations and the institution of grievance and arbitration procedures under existing

---

7. The Board's decision is reported at 192 NLRB No. 9.

agreements would be hampered. Merely meeting and conferring without a prior exchange of requested data, where such is relevant, does not facilitate effective collective bargaining and, therefore, does not meet the requirements of Section 8(a)(1) and (5). Because of the need to facilitate effective collective bargaining, a refusal to furnish data is an unfair labor practice notwithstanding the good faith of an employer in rejecting the request. This has been the declared policy of many of the circuit courts."

Curtiss-Wright Corp., Wright Aero Div. v. N.L.R.B., 347 F.2d 61, 68 (3rd Cir. 1965).

■ It would be difficult indeed for us to believe that the wage surveys under the circumstances here present are neither relevant to a bargainable issue nor of use to the Union in carrying out its functions. In the Fitchburg case, the Company negotiator, Corzine, stated: "We took the survey in order to assess our general wage levels from the top—not for any specific grievance—to find out whether we were generally high, low, in what we term the proper level in that it would in our opinion enable us to attract and retain the necessary people." Corzine explained that it was the Company's national headquarters who wanted the survey, rather than the local Fitchburg management. Even so, the relevance of the survey to the Fitchburg plant's wage rates is obvious and its potential usefulness to the Union cannot be disputed. General Electric set its wage rates based on its ability to recruit and retain personnel at its separate plant locations. We are not so naive as to believe that merely because General Electric's negotiators were careful not to mention the wage surveys in discussions with the Union they were thereby rendered irrelevant to the Company's wage scale at its Fitchburg plant, or that the Company did not rely upon them in assessing its wage rates. Moreover, such reliance was properly inferred

by the Board from the evidence in the record.

■ The Company argues in the Seattle case that because there were no bargaining negotiations or grievances pending at the time the Union requested the survey results, the survey was not relevant to any issue between the parties and was not needed by the Union, and therefore the Company had no duty to supply it. The Seattle employees, however, had been dissatisfied with the wage scale. The Company in effect promised them a wage increase based on the results of the survey it had conducted. When the wage increase never materialized despite the passage of a reasonable amount of time, the Union requested and needed the survey to prepare a grievance with a full understanding of the issues. Under these circumstances, the requested information was unquestionably relevant to the Company's position on wage rates and was necessary to the Union's proper performance of its statutory responsibilities.

## VI

### General Electric's Obligation to Supply Correlated Wage Data

■ Good faith bargaining requires full disclosure by the parties of relevant information in order to produce informed, effective negotiations. This is, as the Supreme Court described it in N.L.R.B. v. Acme Industrial Co., 385 U. S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), a broad "discovery-type standard," permitting the Union access to information which would be useful to the Union and which would effectuate the bargaining process. Without the correlated data in these cases, the Union could not meaningfully analyze and discuss the results of the Company's surveys. Generally, the Union could not determine whether the jobs, equipment, machines and types of work included in the surveys were comparable to those at General Electric's plants.

For example in the case of Fitchburg, since the particular employers were not linked to the wage rates of the jobs surveyed, the Union could not determine whether the reported rates were accurate, whether the rates in the summary (a chart giving the high, median and low rate for each job surveyed) included incentive bonuses, and which of the employers reported in which categories. At Rome, Georgia, where the Union had taken its own survey which indicated higher rates for area employers in some categories than the Company's survey showed, it would be impossible for the Union to determine where the surveys were specifically at variance or to prove that its survey was in fact the correct one. When the Company takes the position that its wage rates are competitive in the local areas and has taken wage surveys of the local areas, which presumably would back up the Company's position, then it is only reasonable that the Union should be given sufficient data to determine whether the Company's position is accurate and justified.

Our result here squares with the Supreme Court's landmark decision, N.L.R.B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), which dealt with the Company's duty to supply the Union with economic data on the subject of wages. Therein, the Union wanted the Company to supply it with information on the Company's financial standing and profits to determine whether the Union should continue to press its wage demands. The Company urged its inability to pay the increased wages as a defense to the Union's request. The Supreme Court held that where an employer asserts a claim of inability to pay without making some effort to substantiate his position, the Board is justified in deciding that the employer failed to bargain in good faith in violation of the Act. The Court stated in an oft-quoted passage:

"Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."

■ The *Truitt* rationale has not been confined to cases in which the employer's defense is inability to pay. N.L.R.B. v. Western Wirebound Box Co., 356 F.2d 88, 90–91 (9th Cir.1966). Where, as here, the employer defends its wage scale by contending it is "proper," and implements a policy of paying wages commensurate with the local wage standards, then good faith bargaining requires the production of reasonable proof to substantiate his claims. In the context of the present cases, the give-and-take of bargaining and the grievance procedures are rendered less effective by General Electric's withholding of correlated data from the Union's scrutiny. If the Union cannot meaningfully evaluate the employer's proof, it cannot know whether the company's claims are honest or accurate. The employer must be ready to back up its wage claims with factual proof which affords the Union an opportunity to fairly understand the merits of the employer's position.

General Electric has been required in other circuits in past cases to supply the Union with survey data. General Electric Co. v. N.L.R.B., 414 F.2d 918, 924–925 (4th Cir.1969); General Electric Co., Battery Prod., Cap. Dept. v. N.L.R.B., 400 F.2d 713, 724–726 (5th Cir. 1968). In those decisions the Fourth Circuit and the Fifth Circuit used a "broad" application of the *Truitt* rationale to find a failure by General Electric to comply with the Act in withholding the wage survey data. It is a very short step to hold further that the Board has discretion to require correlation of that survey data.

VII

*General Electric's Defenses*

■ Confidentiality of the survey data cannot stand as a defense to requiring General Electric to produce the correlated data. General Electric voluntarily agreed with the employers it surveyed that the correlated data would not be disclosed to third parties. Then, in the proceedings before the Board, the Company contended that such agreements are sufficient to vitiate its responsibilities under the Act. We disagree. It is well established that the "alleged confidentiality of relevant economic data needed for informed bargaining is no defense." N.L.R.B. v. Arkansas Rice Growers Cooperative Assoc., 400 F.2d 565, 567 (8th Cir.1968); accord N.L.R.B. v. Frontier Homes Corp., 371 F.2d 974, 979 (8th Cir.1967); Curtiss-Wright Corp., Wright Aero Div. v. N.L.R.B., supra, 347 F.2d at 71.

Employers cannot be allowed to collect wage information on a pledge of confidentiality to parties outside the bargaining unit under these circumstances, then turn around and deny the Union the use of that data based on its voluntary pledge. General Electric makes much of its argument that if we require the names of the area employers to be correlated with the wage data, they would refuse to supply any such information to General Electric in the future. The simple answer to that is that there are other ways to obtain the same information without violating the employers' confidence. General Electric and the Union could agree upon a neutral third party to take the survey whereupon each would be given the same quantity of wage data and the secrecy of the individual employer's data would be maintained. This would place the parties on equal footing at the bargaining table, without depriving them of relevant wage information.

We find no merit to any of the Company's other defenses in these cases.

The Board's orders will be enforced.