**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 18-1640 & 18-1973
_____

CROZER-CHESTER MEDICAL CENTER;
DELAWARE COUNTY MEMORIAL HOSPITAL,
Petitioners/Cross-Respondents

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross-Petitioner
_____

On Petition for Review and Cross-Petition for Enforcement
from the National Labor Relations Board
(Nos. 04-CA-172296 & 04-CA-172313)

Argued:  January 23, 2019

Before:  CHAGARES and BIBAS, <u>Circuit</u> <u>Judges</u>, and
SÁNCHEZ, <u>Chief</u> <u>District</u> <u>Judge</u>[+].

(Filed: September 24, 2020)

_____

[+] The Honorable Juan R. Sánchez, Chief United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Andrew M. Grossman **[ARGUED]**
Richard Bryan Raile
Baker & Hostetler
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036

      Counsel for Crozer-Chester Medical Center and
Delaware County Memorial Hospital

David Habenstreit
Elizabeth A. Heaney
Gregory P. Lauro **[ARGUED]**
National Labor Relations Board
1015 Half Street, S.E.
Washington, DC 20570

      Counsel for National Labor Relations Board

Claiborne S. Newlin **[ARGUED]**
Jonathan K. Walters
Markowitz & Richman
123 South Broad Street
Suite 2020
Philadelphia, PA 19109

      Counsel for Pennsylvania Association of Staff Nurses
& Allied Professionals

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

It has long been established that an employer, as part of its obligation under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 et seq., to bargain in good faith with a union, must furnish to the union all information relevant to the union's bargaining obligations. In this case, a union representing certain employees of a healthcare network learned that the network was being sold to another entity. And it also learned — from the employer itself — that the sale agreement contained information bearing on the terms and conditions of its members' employment. So the union asked the employer for a full copy of the sale agreement for "effects bargaining." But the employer, asserting that the agreement was confidential and not relevant to collective bargaining, refused to provide any of it. Eventually, the union filed unfair labor charges with the National Labor Relations Board (the "Board"), which found that at least part of the agreement was indeed relevant and that the employer, in failing to turn it over, violated the NLRA. As a remedy, the Board ordered the employer to provide a complete, unredacted copy of the agreement to the union. The employer now petitions us to review the Board's order, and the Board cross-petitions to enforce it. For the following reasons, we conclude that substantial evidence supported the Board's conclusion that the employer violated the NLRA, but we also conclude that the Board abused its broad remedial discretion in ordering the employer to disclose the entire agreement. We therefore will grant the employer's petition in part and deny it in part, grant

3

the Board's cross-petition in part and deny it in part, and remand to the Board for further proceedings.

I.

A.

Crozer-Keystone Health System ("Crozer") is a healthcare network that — at least at the start of this litigation — comprised four hospitals[1] and several other healthcare facilities. Crozer's employees, at all relevant times, consisted of ten bargaining units, represented in total by five unions. This case is about Crozer's interactions with one of those unions — the Pennsylvania Association of Staff Nurses and Allied Professionals (the "Union").

The Union heard rumors about the sale of Crozer beginning in fall 2015 and engaged in discussions with the putative buyer, Prospect Medical Holdings ("Prospect"), in approximately November 2015. In January 2016, Crozer informed the Union that it had reached a "Definitive Agreement" to be acquired by Prospect. Joint Appendix ("J.A.") 59. Crozer shared with the Union a letter to all Crozer employees and physicians about the Prospect sale on January 8, 2016 (the "January 8 letter"). In that letter, Crozer explained that several things would not change "under [the] Definitive Agreement with Prospect." Id. Crozer wrote that "Prospect will offer to hire active non-union employees in good standing at the rate of pay, title and seniority level at time of close,

_____

[1] Two of those hospitals, Crozer-Chester Medical Center and Delaware County Memorial Hospital, are parties in this case.

4

subject to standard pre-employment screening processes." Id. And Crozer explained that "unionized employees in good standing will be offered employment subject to initial terms set by Prospect," which would "meet with the various labor organizations that represent [Crozer] employees and enter into appropriate recognition agreements with them."[2] Id.

But Crozer also noted in that letter that certain things will change, including that "Prospect will assume [Crozer]'s outstanding pension liability, funding $100 million of the obligation at closing and providing distributions to pay all benefits owed to pension participants and beneficiaries within five years of the closing date." J.A. 60. Attached to the letter was a list of Frequently Asked Questions, which included short explanations about how the Prospect sale would affect the terms and conditions of employment for unionized and non-unionized employees, as well as the continued operation of the hospitals and union relations.

Ten days after receiving a copy of the January 8 letter, the Union emailed Crozer, "requesting the complete Asset Purchase Agreement [("APA")] and all attachments and schedule[s] of the agreement." J.A. 67. The Union wrote that "[u]pon receipt of the agreement we will review and you can

---

[2] The letter also stated that all of Crozer's "hospitals will remain open"; "[c]ritical service lines such as [emergency department], trauma, burn, behavioral health, maternity, neonatal intensive care and pediatrics will stay in place or be expanded"; Crozer's "charity care policies will be maintained"; and "wellness, health education, and other community programs" would remain "at similar levels." J.A. 59.

5

expect a request for effects bargaining shortly after." Id. Crozer responded that it was "unable to give [the Union] a copy of the APA at this time because it is confidential and proprietary." J.A. 69. Crozer explained that the APA "is covered by the terms of a confidentiality agreement to which Crozer is subject" and that "the entire APA is not relevant for effects bargaining over the terms and conditions of employment of bargaining unit members." Id. It told the Union that it was "open to considering any alternative requests [the Union] may have." Id.

That was unacceptable to the Union, which wrote back:

> We were hoping to avoid involving the Labor Board in our request for the APA but we intend to file a charge if [the] Crozer Administration continues to refuse to provide the APA, including attachments and schedules. If your email is intended as an offer to negotiate over confidentiality, the union is prepared to bargain over confidentiality, provided there is an understanding that the APA, with attachments and schedules, will be forthcoming.

J.A. 70. Crozer didn't budge.

Crozer and the Union broached the subject again when they met the next month for a bargaining session over a nursing unit at one of Crozer's hospitals.[3] There, the Union reiterated

---

[3] The Union had been recently certified as the bargaining representative for this unit of nurses, and this session was for initial bargaining.

6

its request for the APA. Crozer again explained "that much of [the APA] was confidential and proprietary," but "that [it] would be willing to determine what was relevant and share that with the Union." J.A. 253. According to a Union official present at that bargaining session, Crozer never explained why the APA was confidential. The two sides, at any rate, remained entrenched in their positions.

The next day, Crozer sent the Union a more official response to its information request. It wrote, among other things:

> [Crozer] objects to the request on the basis that it is premature, overbroad and seeks irrelevant information. Indeed, as you know, the [Crozer] transaction with Prospect is contingent upon regulatory approval that has not yet occurred and as of this point, has not yet even been scheduled. Additionally, as you may be aware, [Crozer's and the Union's attorneys] recently discussed this request. On behalf of [Crozer], [Crozer's attorney] offered to discuss with [the Union] the potential for production of those portions of the [APA] and any attachments and schedules thereto that relate to or affect [Crozer] employees, including those who are members of [the Union]. [The Union's attorney] refused this offer, stating that [the Union] wants everything. [The Union] offered nothing more to explain why the entire document is relevant or needed for it to fulfill its functions as bargaining representative for certain [Crozer] employees. We again renew that offer to discuss which

portions of the documents are relevant to [the Union's] role as bargaining representative with respect to effects bargaining. Please let me know if you would like to have further discussions on this issue.

[Crozer] further objects to the request on the basis that it seeks confidential and proprietary information that is subject to legal prohibitions on disclosure. As [Crozer's attorney] explained to [the Union's attorney], the entire [APA] is the subject of a confidentiality agreement between [Crozer] and Prospect that [Crozer] is legally obliged to follow. Therefore, to the extent the parties were able to reach agreement on the production of any relevant portion of the Agreement, before [Crozer] can turn over anything contained in the Agreement, [the Union] must agree to the terms of a confidentiality agreement acceptable to [Crozer] and Prospect that adequately protects [Crozer's] and Prospect's confidential and proprietary interests in those portions of the [APA] to which [the Union] may be entitled.

J.A. 72–73. The Union did not respond. Instead, four days later, it filed charges with the Board.

Two other unions soon requested from Crozer "sections of the APA that say what Prospect is going to assume and not assume relative to employees." J.A. 74. In response to those requests, Crozer's General Counsel advised Crozer's Vice President of Human Resources, Elizabeth Bilotta, that Crozer

8

"should provide relevant redacted excerpts from the APA" to those two unions, noting that "[t]hat is essentially what [it] previously offered to [the Union] as a compromise." Id.[4]

Although Crozer still had provided no parts of the APA to the Union, the two sides proceeded to engage in effects bargaining over the Prospect sale in late May and early June 2016.

As part of the sale process, Crozer filed a petition in the Delaware County Court of Common Pleas to obtain approval of the sale.[5] Because that petition included the body of the APA, the Union obtained a copy from the Pennsylvania Attorney General's Office on June 6, 2016. Crozer's filings with the Court of Common Pleas, however, did not include the APA's attachments or schedules. At the request of the Attorney General, Crozer provided the Union on June 22 with copies of schedules 4.13(a) ("Employee Benefit Plans") and 4.18(a) ("Labor, Unions, Collective Bargaining Agreements"), but no other attachments or schedules.

B.

---

[4] According to Bilotta, Crozer drafted a confidentiality agreement for those two unions, but it ultimately never needed to use it (or provide those two unions with redacted copies of the APA) because, as we will explain, the APA, minus the attachments and schedules, soon became public as part of a court petition.

[5] The Court of Common Pleas eventually approved the Prospect sale, which was finalized on July 1, 2016.

9

In December 2016, an Administrative Law Judge ("ALJ") held a trial on the charges the Union filed against Crozer. Considering the demeanor of the witnesses, other evidence, and briefing, the ALJ ultimately concluded, in a written opinion, that Crozer had "violated Section 8(a)(5) and (1) of the [NLRA] by failing and refusing to provide the [APA], including all attachments and schedules, that was requested by the [Union]." J.A. 15. The ALJ explained that "it was clear to both parties that the APA contained relevant information and needed to be produced in whole or in part." J.A. 13. In addition, the ALJ observed that "the record contains no explanation why either Crozer or Prospect actually believed that certain portions of the APA were confidential or proprietary," and that Crozer had thus "failed to meet [its] burden of proving a valid confidentiality interest in the APA." J.A. 14.

As a remedy, the ALJ ordered Crozer "to produce to the Union the entire APA with all attachments and schedules." J.A. 15. The ALJ explained that Crozer is "not now entitled to a second chance to assert objections to production that should have been raised in a timely manner when the request was initially made over a year ago. To do so would place [Crozer] in a more advantageous position than [it is in] now." Id.

A panel of the Board adopted the ALJ's order by a vote of 2-1. The Board explained that Crozer never "substantiated [its] asserted confidentiality interest." J.A. 6 n.2. In the Board's view, Crozer also did not "engage in accommodative bargaining at the time [it] first asserted a confidentiality interest," and thus had "unfairly imposed, and unjustly reaped the benefit of, an additional year of delay upon an uninformed bargaining partner." Id.

10

One Board Member dissented in part. He agreed that Crozer violated the NLRA by not providing the parts of the APA "that were non-confidential and relevant for purposes of effects bargaining." J.A. 7. But he believed the Board's remedy — ordering production of the entire APA, including all schedules and attachments — was impermissibly punitive. He explained that Crozer has "legitimate confidentiality interests that deserve protection, and the Union had no right to insist on the blanket disclosure of these documents." Id. Accordingly, he would have ordered Crozer just to "provid[e] such relevant and non-confidential portions of the APA to the Union and engag[e] in accommodative bargaining over the remaining confidential relevant portions." Id.

Crozer timely petitioned for review, and the Board cross-petitioned for full enforcement of its order.

## II.

We have jurisdiction under 29 U.S.C. § 160(e) and (f), and the Board had jurisdiction under 29 U.S.C. § 160(a). In reviewing the Board's decision,[6] we accept as conclusive its

---

[6] "Where the Board adopts the ALJ's findings of fact and conclusions of law, it is the ALJ's determinations that we review." Trafford Distrib. Ctr. v. NLRB, 478 F.3d 172, 179 (3d Cir. 2007) (quoting SCA Tissue N. Am. LLC v. NLRB, 371 F.3d 983, 988 (7th Cir. 2004)). But "[w]here the Board has adopted the ALJ's decision in part, the Court reviews both." Id. Here, the Board generally "affirm[ed] the [ALJ's] rulings, findings, and conclusions," and adopted its recommended Order. J.A. 6. But it also provided additional discussion of its

11

factual findings if they are "supported by substantial evidence given the record as a whole" and determine whether the decision "is in accordance with applicable law." Hertz Corp. v. NLRB, 105 F.3d 868, 872–73 (3d Cir. 1997). If the Board's "construction of the [NLRA] is reasonably defensible, it should not be rejected merely because [we] might prefer another view of the statute." Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). And the Board's remedial authority "is a broad discretionary one, subject to limited judicial review." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 216 (1964).

## III.

Crozer argues that the Board erred in finding that it had violated the NLRA. We hold that, despite Crozer's protests, substantial evidence did support the Board's finding that the Union sufficiently established the relevance of at least part of the APA and that Crozer did not establish any confidentiality interest in it. Substantial evidence thus supports the Board's conclusion that Crozer, by failing to provide those relevant parts to the Union, violated the NLRA. But we also hold that the Board, in ordering Crozer to disclose the entire APA, which included information never established as relevant, abused its broad remedial discretion.

## A.

own. We therefore review both the Board and the ALJ decisions.

12

1.

The NLRA prohibits employers from refusing to bargain in good faith with unions representing their employees regarding "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). While an employer has no duty to bargain about its decision to sell its business, an employer is obligated to bargain with a union over the effects of such a sale because "the effects of that sale are considered 'conditions of employment' within the meaning of" § 158(d). E.I. DuPont de Nemours & Co. v. Sawyer, 517 F.3d 785, 793 (5th Cir. 2008) (quotation marks omitted); see also First Nat'l Maint. Corp. v. NLRB, 452 U.S. 666, 686 (1981); NLRB v. Royal Plating & Polishing Co., 350 F.2d 191, 196 (3d Cir. 1965). An employer's "refus[al] to bargain collectively with the representatives of [its] employees" constitutes an unfair labor practice under NLRA section 8(a)(5), 29 U.S.C. § 158(a)(5). Violation of NLRA section 8(a)(5) also results in a derivative violation of section 8(a)(1), 29 U.S.C. § 158(a)(1), which provides that employers who "interfere with, restrain, or coerce employees in the exercise of the[ir] rights guaranteed" by the NLRA have committed an unfair labor practice, id.; see N.J. Bell Tel. Co. v. NLRB, 720 F.2d 789, 791 n.2 (3d Cir. 1983); cf. Metro. Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983) ("Although §§ 8(a)(1) and 8(a)(3) are not coterminous, a violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1).").

The duty to bargain in good faith includes "the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties." NLRB v. Acme Indus. Co., 385 U.S. 432, 435–36

13

(1967). This obligation promotes intelligent and informed representation of union members.

The threshold question is whether the requested information is relevant to fulfilling the Union's bargaining duties. We have determined that "if the requested data is relevant and, therefore reasonably necessary, to a union's role as bargaining agent," then an employer's failure to furnish this information constitutes an unfair labor practice under section 8(a)(5). Curtiss-Wright Corp. v. NLRB, 347 F.2d 61, 68 (3d Cir. 1965); see Hertz, 105 F.3d at 873.[7] Courts and the Board employ a liberal and broad "discovery-type standard" in assessing relevance in the labor context. Acme Indus., 385 U.S. at 437. Accordingly, the burden of showing relevance is light and requires only "the 'probability that the desired information [is] relevant.'" Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB, 711 F.2d 348, 359 (D.C. Cir. 1983) (alteration in original) (quoting Acme Indus., 385 U.S. at 437); see Country Ford Trucks, Inc. v. NLRB, 229 F.3d 1184, 1191 (D.C. Cir. 2000) ("[T]he threshold for relevance is low."). This undemanding standard of relevance is necessary because "[u]nless each side has access to information enabling it to discuss intelligently and deal meaningfully with bargainable issues, effective negotiation cannot occur." Local 13, Detroit Newspaper Printing & Graphic Commc'ns Union

---

[7] We note that relevant information must be produced unless, as the Board points out, the employer can demonstrate a "legitimate and substantial countervailing" interest, such as that confidentiality may be compromised by the employer's disclosure. Board Br. 22. Crozer's challenge to the Board's ruling rejecting its confidentiality claim is addressed in section III.B., infra.

14

v. NLRB, 598 F.2d 267, 271 (D.C. Cir. 1979) (citing Curtiss-Wright, 347 F.2d at 68); see NLRB v. Pub. Serv. Elec. & Gas Co., 157 F.3d 222, 230 (3d Cir. 1998). The relevance standard is not unlimited, however, as it safeguards against unfounded "fishing expeditions" by parties.[8] See Detroit Edison Co. v. NLRB, 440 U.S. 301, 318 (1979) (declining to endorse "the proposition that union interests in arguably relevant information must always predominate over all other interests, however, legitimate"). Determinations of relevance are made by considering the facts and circumstances present in individual cases. See Oil, Chem. & Atomic Workers, 711 F.2d at 359 (citing NLRB v. Truitt Mfg. Co., 351 U.S. 149, 153 (1956)).

2.

We hold that substantial evidence in the record supports the ALJ's finding that the APA contained relevant information

---

[8] We emphasize that nothing in this opinion should be construed as encouraging unions to make overbroad information requests hoping for a kernel of relevant information or, as Crozer fears, as endorsing a rule that an employer "will be punished unless it capitulates entirely." Crozer Br. 3. In this regard, we agree that "just as there are some limits as to what is discoverable information under the [Federal] Rules of Civil Procedure, there are similar limits to discoverable information in the collective-bargaining context. These limits are not stringent, however." NLRB v. George Koch Sons, Inc., 950 F.2d 1324, 1332 (7th Cir. 1991).

15

for the Union's effects bargaining. The ALJ, in fact, found that Crozer admitted that parts of the APA were relevant, and this finding was also supported by substantial evidence. For instance, Crozer's initial response to the Union's request was that "the entire APA is not relevant for effects bargaining" — not denying partial relevance and essentially acknowledging that some of the APA is relevant. J.A. 69. In addition, when other unions requested copies of the APA, Crozer's General Counsel wrote: "I believe we should provide relevant redacted excerpts from the APA to [the other unions]. That is essentially what we previously offered to [the Union] as a compromise." J.A. 74 (emphasis added).[9] As the ALJ observed, Crozer proffered no explanation as to why that redacted version was not provided to the Union. And if the concession of relevance by Crozer was not clear, at the trial before the ALJ, Crozer's sole witness (Bilotta) explicitly made this admission in her testimony. See J.A. 308 ("Q[:] You're aware that some items in the APA are relevant to bargaining unit employees at [Crozer], correct? A[:] Yes."); see also J.A. 309 ("Q[:] . . . [W]ould items in an APA be relevant to contract negotiations? A[:] Yes, generally, yes.").

The ALJ specifically found relevant provisions pertaining to "employees' terms and conditions of employment, the name of the hospitals, the continuation or expansion of certain service lines, capital investments, standards of care, equipment and property." J.A. 13. The ALJ

---

[9] Crozer argues that its preparation of a redacted copy of the APA for other unions should be understood as a compromise, not a concession of relevance. But Crozer glosses over the statement of its own internal counsel that the APA contained relevant parts.

16

explained that this information, at a minimum, "would be relevant to the availability and location of unit work, the potential for layoffs and hiring, whether the pension plan would be fully funded, and whether non-unit employees were receiving pay or benefits the Union might want to negotiate (for parity) on behalf of unit employees." Id. It was thus clear to both Crozer and the Union that the APA contained relevant information directly bearing on the terms and conditions of unionized employees. See Compact Video Servs., Inc., 319 N.L.R.B. 131, 144 (1995) (acknowledging the "legal realit[y]" that a selling employer "must bargain about the effects of . . . a decision [to sell] on unit employees, and as an incident thereto, it must normally give the union access, upon request, to the sale agreement and more generally, to 'information concerning the sale'"), enforced, 121 F.3d 478, 483 (9th Cir. 1997) (enforcing the Board's order "to provide [a] [u]nion with contracts relating to the acquisition and takeover"). Under the expansive standard for relevance and according proper deference to the Board's finding of relevance, we perceive no reason to upset the Board's determination that parts of the APA were relevant. See NLRB v. Compact Video Servs., Inc., 121 F.3d 478, 483 (9th Cir. 1997) (noting "the great weight we must give the Board's finding that the information in the sales contract is relevant"); NLRB v. New Eng. Newspapers, Inc., 856 F.2d 409, 414 (1st Cir. 1988) ("[T]he Board's determination of relevancy is entitled to great deference.").

3.

Crozer's main argument is narrow: that it had no obligation to furnish the APA or any part of it to the Union because the Union did not specify its relevance to Crozer. We

disagree and determine that Crozer had a duty to furnish at least part of the APA under the circumstances here.

a.

Allocation of the burden to demonstrate relevance depends upon the type of information that a union requests.  As we have held, "wage and related information pertaining to employees in the bargaining unit is presumptively relevant." Curtiss-Wright, 347 F.2d at 69; see U.S. Testing Co. v. NLRB, 160 F.3d 14, 19 (D.C. Cir. 1998) ("For information about employees in the bargaining unit, it is presumed that the requested information is relevant to the union's negotiations."). Unions thus are not required to demonstrate the precise relevance of requested information that is presumptively relevant as such information "concerns the core of the employer-employee relationship," unless an employer is able to rebut its relevance.  Curtiss-Wright, 347 F.2d at 69.  This rule regarding presumptively relevant materials "avoids potentially endless bickering between management and the union over the specific relevance of information, the very nature of which ought to render its relevance obvious." Emeryville Rsch. Ctr. v. NLRB, 441 F.2d 880, 887 (9th Cir. 1971); see Oil, Chem. & Atomic Workers, 711 F.2d at 359 ("[A] presumption of relevance, of course, may substantially simplify the assessment of a union's request for information."). However, requests for other information, such as information pertaining to non-bargaining unit employees, do not implicate a presumption of relevance, and "a union must, by reference to the circumstances of the case, as an initial matter, demonstrate more precisely the relevance of the data it desires."  Curtiss-Wright, 347 F.2d at 69; see U.S. Postal Serv. v. NLRB, 18 F.3d 1089, 1101 (3d Cir. 1994).  The same liberal standard of

relevancy applies, regardless of whether the request for information is subject to the presumption of relevance. Curtiss-Wright, 347 F.2d at 69.

The ALJ began its analysis by discussing presumptive relevance. Referencing Crozer's January 8 letter "that the APA contained information about how the operation would change and not change under new management with regard to such things as [, inter alia,] employees' terms and conditions of employment," the ALJ ultimately found that "[s]ome of this information would be presumptively relevant." J.A. 13; see U.S. Postal Serv., 18 F.3d at 1100–01 (noting that presumptively relevant information includes "[i]nformation about the terms and conditions of employment" and "is required to be produced"). Substantial evidence in the record supports this finding. Crozer informed the Union (and Crozer's work force) that the APA covered multiple items bearing upon terms and conditions of employment, including offers of employment for unionized employees and the status of several service lines and hospitals. J.A. 59–60. The Court of Appeals for the First Circuit, in fact, has ruled that an employer must provide a union with its contract of sale because the contract of sale "concern[ed] a condition of employment, [and] . . . it is presumptively relevant and must be disclosed unless it plainly appears irrelevant." New Eng. Newspapers, 856 F.2d at 413 (quotation marks omitted). As a result, substantial evidence supports the finding that at least some of the information in the APA was presumptively relevant, and Crozer did not rebut its relevance.[10]

---

[10] We note, however, that the ALJ was unclear regarding exactly what portions of the APA were presumptively relevant.

Even if the Union was not entitled to this presumption regarding the relevant evidence in the APA, any specificity lacking in its request for the APA would not change the result given the circumstances of this case. Crozer asserts that it did not "understand [the Union's] asserted need for the Purchase Agreement," Crozer Reply Br. 8, and contends that the Union did not meet a standard set forth in our decision in Hertz Corp. v. NLRB that a union requesting information pertaining to non-members of a bargaining unit has a "minimal obligation" to advise the employer of the factual basis for its request, 105 F.3d at 874.[11]

But the Hertz decision also provides that in some cases, a union's reason "will be readily apparent," and "[w]hen it is clear that the employer should have known the reason for the union's request for information, a specific communication of the facts underlying the request may be unnecessary." Id. This is such a case and, hence, Hertz does not absolve Crozer of its obligation to provide relevant parts of the APA to the Union.

---

[11] The Board has observed that Hertz creates a "more demanding standard" than it recognizes. H&R Indus. Servs., Inc., 351 N.L.R.B. 1222, 1224 (2007). We do not here intend to expand this obligation. Moreover, insofar as Hertz involved a different context — an investigation of discrimination — the standard we enunciated was tied to that context: the union "needed only to communicate some reasonable basis for its suspicion that the employer might be engaging in discrimination." 105 F.3d at 874. Perhaps this is why the Union, appearing in this case as an intervenor, did not refer to Hertz in its brief. However, we will assume without deciding that the standard set forth in Hertz applies to this case.

20

Our determination is compelled by analysis of the context of the Union's request as well as the facts and circumstances present. See Truitt Mfg., 351 U.S. at 153; Curtiss-Wright, 347 F.2d at 69. The Union was advised in Crozer's January 8 letter that the APA had been finalized and that the final step — regulatory approval of the sale — would "take several months." J.A. 60. This meant that the Union would need to move quickly to bargain, and as we have noted:

> [d]uring a transition period between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer [and] is uncertain about the new employer's plans . . . . While being concerned with the future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer.

Grane Health Care v. NLRB, 712 F.3d 145, 153 (3d Cir. 2013) (first alteration in original) (quoting Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 39 (1987)).

The Union requested a single document from Crozer to prepare for and conduct effects bargaining: the APA. See J.A. 13–14 n.8 (ALJ noting "that the Union indicated a desire to obtain the APA with all attachments and schedules for use in bargaining over the effects of the sale"); see also Crozer Reply Br. 12 ("[T]he right to effects bargaining [is] virtually always triggered by the sale of a business."). A sales agreement such as the APA is what the Board has acknowledged to be "the

21

single, most authoritative and reliable source of data which would have formed the underpinnings of effects bargaining." New Eng. Newspapers, Inc., 286 N.L.R.B. 124, 128 (1987), enforced, 856 F.2d 409 (1st Cir. 1988). The Crozer point person for responding to the Union's request — Bilotta, Crozer's vice president of human resources — testified before the ALJ that she had in excess of thirty-five years of experience. See J.A. 13 (ALJ finding that Bilotta "has extensive experience dealing with information requests"). Bilotta candidly agreed that generally, the contents of an APA would be relevant to bargaining, J.A. 309 ("Q[:] . . . [W]ould items in an APA be relevant to contract negotiations? A[:] Yes, generally, yes."), and, as discussed earlier, she admitted that parts of this particular APA would be relevant to the Union. Ultimately, the ALJ found that "experienced bargaining parties, such as these, could reasonably expect the Union to use [the APA] in connection with [the] upcoming contract negotiations." J.A. 13–14 n.8.[12] Hence, the Hertz standard is

---

[12] It is hardly unusual for unions to request (and receive) sales agreements, and other decisions have required sales agreements and similar documents to be produced when requested by unions representing sellers' employees in various circumstances. See, e.g., Supervalu, Inc. v. NLRB, 184 F.3d 949, 951–53 (8th Cir. 1999); Compact Video Servs., 121 F.3d at 483; Providence Hosp. v. NLRB, 93 F.3d 1012, 1018–20 (1st Cir. 1996); Mary Thompson Hosp. v. NLRB, 943 F.2d 741, 746–47 (7th Cir. 1991); New Eng. Newspapers, 856 F.2d at 413–14; Sierra Int'l Trucks, Inc., 319 N.L.R.B. 948, 950–51 (1995); St. Marys Foundry, 284 N.L.R.B. 221, 233 (1987), enforced, 860 F.2d 679 (6th Cir. 1988); J.A. 13 (ALJ decision acknowledging that "[i]n prior cases, the Board has ordered production of sales agreements for the purchase of employers

met because Crozer "should have known the reason for the union's request for [the APA]." 105 F.3d at 874.

Other facts and circumstances unique to this case support our conclusion. In its January 8 letter, Crozer advised the Union as well as its employees and physicians that under the APA, important operations and conditions would and would not change and informed them about particular items of interest that would impact them. Items chosen by Crozer to mention in its letter included hiring of union workers with "initial terms set by [the new employer]," hiring non-union employees, continuation of certain service lines, employee pension liability, impacts of becoming a for-profit hospital, and the duration of existing health and welfare benefits. J.A. 59–66; see also J.A. 61–63 (providing, in January 8 letter, "Frequently Asked Questions" regarding "Definitive Agreement with Prospect," such as "What does this mean for unionized Crozer-Keystone employees?," "Will Crozer-Keystone employees receive the same benefits?," and "What will happen to labor union relations under Prospect?"); J.A. 95–97 (listing APA schedules such as "Closed Hospital Departments," "Crozer Retention Bonuses," "Crozer Pension Plan Actuarial Assumptions, Terms, and Conditions," "[Worker Adjustment and Retraining Notification (WARN)] Act," and "Crozer Pension Contributions Schedule"). Accordingly, Crozer should have known the reason why the Union would request the APA that contained the items it had broadcasted to the Union and its work force.

---

where the agreements were requested by unions that represented employees employed by the seller").

23

The Court of Appeals for the First Circuit's decision in Western Massachusetts Electric Co. v. NLRB, 573 F.2d 101 (1st Cir. 1978), is instructive. In that case, the employer contended that "the union never made clear the reasons why it wanted [certain] cost information." Id. at 107. But the court noted that the employer had "put costs in[to] contention" through assertions it had made to the union. Id. The court concluded that the information should be produced, and addressing the employer's assertion, determined that in light of the employer's representations, the employer "appear[ed] to have had a sufficient basis for understanding the purpose of the union's request." Id. The First Circuit's decision is not an outlier. See U.S. Testing, 160 F.3d at 19–20 (rejecting employer's contention that it had insufficient notice regarding the potential relevance of a union request for individual insurance claims information because "context is everything," and the employer "put on the table" the concern of growing health care costs); Providence Hosp., 93 F.3d at 1019–20 (holding that where, inter alia, the employer distributed written information about a merger, including some workplace changes such as "broad hints that it already had formulated some ideas relative to future staffing of the new system" and its expected regulatory approval, "[u]nder the totality of the circumstances that existed here—especially the employer's expressed confidence that the merger would take place soon and the emphasis in its handouts on the reallocation of personnel," substantial evidence supported the Board's order requiring disclosure of merger-related documents); Caldwell Mfg. Co., 346 N.L.R.B. 1159, 1160 (2006) (ruling that an employer "made the information relevant and created the obligation to provide the requested data" because of the employer's factual assertions to the union). Because Crozer

24

chose to put items in the APA in play, it is "readily apparent" why the Union would request the APA. Hertz, 105 F.3d at 874.

Relatedly, the Union was entitled to verify or substantiate the representations that Crozer made to the employees in the January 8 letter. See Truitt Mfg., 351 U.S. at 152–53 (determining that an employer committed an unfair labor practice when it refused a union request to substantiate a claim that it could not pay higher wages); E.I. DuPont de Nemours & Co. v. NLRB, 489 F.3d 1310, 1316 (D.C. Cir. 2007) (holding "that a union is entitled to inspect the data relied on by an employer and does not have to accept the employer's bald assertions or generalized figures at face value"); W. Mass. Elec. Co., 573 F.2d at 107 (acknowledging that when an employer makes "assertions, the duty to bargain in good faith required [the employer] to provide, upon demand, such information as was reasonably necessary to substantiate them"); see also Mary Thompson Hosp., 943 F.2d at 747 (holding that a union was entitled to a sales and transfer agreement "in order to verify the data it obtained through alternative sources"). The failure of Crozer to furnish any part of the APA to the Union made such verification and substantiation impossible. See J.A. 295 (Bilotta testimony acknowledging the frustration of the union representative at bargaining and the representative's feeling that "we were in the light and they were in the dark" without the APA). We agree with the ALJ's conclusion that "the Union was entitled to the actual document to verify the summary [in the January 8 letter] and to obtain additional details." J.A. 13.

In sum, it is clear that Crozer should have known the reason for the Union's request for the APA. The ALJ found that "it was clear to both parties that the APA contained

25

relevant information." Id. It was unnecessary, therefore, for the Union to communicate specific facts underlying the request. Hertz, 105 F.3d at 874.[13] We emphasize that meeting the standard set forth in Hertz depends upon the circumstances of each case and caution that a union's mere invocation of the necessity of a sales agreement for bargaining in the context of an employer's sale may not be enough.

b.

We turn to the employer's obligation to produce relevant information. Notwithstanding the relevance of at least some of the APA, Crozer failed to furnish the Union with any part of it. This failure was the basis of the Board's ultimate conclusion that Crozer violated section 8(a)(5) and (1). We agree.

The employer must disclose relevant parts of a document in response to a union request. This disclosure duty exists even if other parts of a document are not subject to production. See Country Ford Trucks, 229 F.3d at 1192 (determining that even if "the Union's request was overbroad,

---

[13] In addition, in the context of this case, the Union could not be blamed for not providing more specificity regarding which parts of the APA it desired as it had no idea of the APA's contents, save a few summarized aspects in Crozer's January 8 letter. See Olean Gen. Hosp., 363 N.L.R.B. No. 62, slip op. at 10 (Dec. 11, 2015) (rejecting an employer's claim that the Union failed to show a "specific need" for a requested report and holding that "[t]he inability to identify specific relevant information in the report can hardly be held against the Union, which has never seen the report").

26

this does not excuse the [employer] from providing the requested information to which the Union had an undisputed right"); Oil, Chem. & Atomic Workers, 711 F.3d at 361 ("[T]he mere fact that a Union's request encompasses information which the employer is not legally obligated to provide does not automatically excuse him from complying with the Union's request to the extent that it also encompasses information which he would be required to provide if it were the sole subject of the demand." (quoting Fawcett Printing Corp., 201 N.L.R.B. 964, 975 (1973))); id. at 362 (noting that a claim that some requested information encompassed trade secrets "could not justify the companies' total noncompliance with the unions' requests").[14]  The ALJ was correct in holding that the APA contained relevant information and that it "needed to be produced" at least "in part."  J.A. 13.

The Federal Rules of Civil Procedure "frequently" provide useful "guidance" to the Board.  NLRB Div. of Judges, Bench Book i (2019); cf. NLRB v. Yawman & Erbe Mfg. Co., 187 F.2d 947, 949 (2d Cir. 1951) ("The rule governing disclosure of data [to a union] is not unlike that prevailing in discovery procedures under modern codes.").  The discovery standards set forth in the Rules and the decisions that apply them lend support to our analysis.

Federal Rule of Civil Procedure 34(b)(2)(C) provides that a party may object to a document request, but "must specify the part and permit inspection of the rest."  The advisory committee note explains that the rule "make[s] clear

---

[14] Application of the disclosure principles discussed herein depends upon the facts and circumstances of each case. See Truitt Mfg., 351 U.S. at 153.

27

that, if a request for production is objectionable only in part, production should be afforded with respect to the unobjectionable portions." Fed. R. Civ. P. 34 advisory committee's note to 1993 amendment; see Bogosian v. Gulf Oil Corp., 738 F.2d 587, 595 (3d Cir. 1984) ("Of course, where the same document contains both facts and [privileged material], the adversary party is entitled to discovery of the facts."); Breon v. Coca-Cola Bottling Co., 232 F.R.D. 49, 55 (D. Conn. 2005) ("It is not proper to withhold an entire document from discovery on grounds that a portion of it may be privileged.").[15] So, as in a civil lawsuit, an employer facing a request for documents must furnish the union with the relevant material upon demand, even if other material covered by the demand is not subject to production. The ALJ correctly held that Crozer violated this obligation given the facts and circumstances in this case.

In addition, the ALJ held that Crozer "failed to indicate what portions [of the APA it] deemed irrelevant and confidential, or explain why." J.A. 13. Substantial evidence supports this determination, and, indeed, the Board has applied its "straightforward" standard that an employer responding to a union information request has a duty "to adequately explain

---

[15] We have applied similar rules of production in the Freedom of Information Act context. For instance, we have determined that "'[a]n agency cannot justify withholding an entire document simply by showing it contains some exempt material,'" and, instead, "the agency must demonstrate that all reasonably segregable, nonexempt information was released." Abdelfattah v. U.S. Dep't of Homeland Sec., 488 F.3d 178, 186 (3d Cir. 2007) (quoting Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)).

why [unproduced] information will not be furnished." Regency Serv. Carts, Inc., 345 N.L.R.B. 671, 673 (2005); see also Board Br. 41 (arguing that "[a]ll Crozer needed to do was 'at any time, sen[d] an email to the Union with a redacted version of the APA, including the list of schedules . . . and an explanation as to why certain information was being withheld'" (quoting J.A. 38)); Oral Arg. Tr. 24:18–21 (Board arguing that "it's not an overwhelming obligation" because "[a]ll [Crozer had] to do [was] . . . identify what [it was] not providing, and explain why"). We note that the Federal Rules of Civil Procedure are in accord. Rule 34 provides that a responding party has the obligation to "state whether any responsive materials are being withheld" and state the reason or reasons why. Fed. R. Civ. P. 34(b)(2)(C). See Smash Tech., LLC v. Smash Sols., LLC, --- F.R.D. ---, 2020 WL 3546254, at *5 (D. Utah June 30, 2020) (citing Rule 34(b)(2)(C) and observing that a responding party "must state whether responsive materials were withheld and link each specific objection to what was withheld"). This explanation by the responding party should provide enough detail to "facilitate an informed discussion" about why the material was withheld. Fed. R. Civ. P. 34 advisory committee's note to 2015 amendment.

The ALJ noted that Crozer should have produced relevant parts of the APA "along with an explanation of what they were withholding so the parties could engage in meaningful discussions about the proper scope of production." J.A. 14; see J.A. 13 n.8 (ALJ observing that Crozer was "best situated to initiate a discussion of [what would be withheld] because they were in possession of the information"). Although Crozer did eventually assert a boilerplate objection that the Union request for the entire APA sought "irrelevant

29

information" and was premature and overbroad, J.A. 72, Crozer never specified which parts of the APA this objection pertained to or why and, of course, it withheld everything. Accordingly, Crozer failed to meet its production obligations in the circumstances of this case.

The above-described disclosure obligation — furnishing relevant parts of a document to the requesting party and identifying what has been withheld and the reasons why — was not foreign to Crozer. Indeed, at the trial before the ALJ, Crozer's sole witness (Bilotta) testified about what she does when she receives a request for information from a union — a "pretty frequent" occurrence. J.A. 290. For instance, Bilotta testified that when a union requests information, "I'll provide all of the information that is relevant and I'll [include] in my response as to what I'm not providing and why . . . and that we're willing to continue discussions about it." J.A. 291. Considering this testimony about Bilotta's "standard operating procedure," the ALJ noted that "it is unclear why she did not follow it with regard to the APA." J.A. 13. This failure is especially curious given that Crozer supplied nothing to the Union but gave parts of the APA to other unions and that Crozer made public the APA (without schedules or attachments) through its June 3, 2016 filing in the Delaware County Court of Common Pleas, although the Union only first saw the APA when it was provided by the Pennsylvania Attorney General's Office on June 6, 2016.

Crozer strenuously complains that the Union failed "to meet it halfway," Crozer Br. 1, and was "stonewalling," Crozer Reply Br. 21, by refusing to recede from its request for the entire APA. The Union certainly could have been more

communicative, and we cannot say that its conduct was exemplary. But this does not absolve Crozer of its production obligations. The ALJ correctly determined that Crozer could not avoid or delay meeting its obligation to produce relevant portions of the APA through, for instance, seeking alternative requests. See U.S. Testing, 160 F.3d at 21 (noting that "the onus is on the employer because it is in the better position to propose how best it can respond to a union request for information," and that "[t]he union need not propose the precise alternative to providing the information unedited"). In particular, as the ALJ recognized, Crozer was "not entitled to withhold information [it] already had an obligation to provide as leverage in asking the Union to accept less than it may otherwise be entitled to receive." J.A. 14. This is tantamount to a responding party holding "hostage" information that it should have produced until the requestor capitulates to the responding party's demands for concessions — a type of gamesmanship that will not promote justice in the labor or any civil context. Further, we agree with the ALJ that because of Crozer's failure to comply with its production obligations, "the Union was not put to the test of altering its position." Id.

* * * * *

Crozer's failure to disclose relevant information from the APA to the Union "does not facilitate effective collective bargaining and, therefore, does not meet the requirements of Section 8(a)(1) and (5)." Curtiss-Wright, 347 F.2d at 68. We will enforce the Board's order and deny Crozer's petition regarding this issue.

31

B.

Crozer next argues that, putting relevance aside, it did not have to provide the Union with the APA because it was confidential. This argument also cannot withstand scrutiny.

When a union requests relevant, yet confidential information, "the Board is required to balance a union's need for the information against any 'legitimate and substantial' confidentiality interests established by the employer." Resorts Int'l Hotel Casino v. NLRB, 996 F.2d 1553, 1556 (3d Cir. 1993) (quoting Pa. Power & Light Co., 301 N.L.R.B. 1104, 1105 (1991)); see Detroit Edison, 440 U.S. at 318–20. But importantly, "[b]efore such a balancing takes place, the party seeking to withhold relevant information on the basis of confidentiality bears the burden of demonstrating a legitimate claim of confidentiality." Resorts Int'l, 996 F.2d at 1556. And "an employer cannot prevent production of [relevant] information simply by asserting that it is 'confidential.'" Nat'l Steel Corp. v. NLRB, 324 F.3d 928, 934 (7th Cir. 2003); see NLRB v. Pfizer, Inc., 763 F.2d 887, 891 (7th Cir. 1985) (rejecting the notion that "an employer's bare assertion that the information sought is confidential entitle[s] it to resist production with impunity"). Further, the employer "must offer to accommodate both its concern and its bargaining obligations, as is often done by making an offer to release information conditionally or by placing restrictions on the use of that information." U.S. Testing, 160 F.3d at 20.

Substantial evidence supported the ALJ's finding that Crozer failed to meet its "burden of proving a valid confidentiality interest in the APA." J.A. 14. The record reveals that Crozer's asserted confidentiality interest in the

32

APA stemmed from the agreement's confidentiality provision. That is, Crozer's concern was that providing the Union with a copy of the APA simply would violate the agreement's clause that generally prohibits disclosure of the agreement to third parties. As Crozer itself put it in an email to the Union:

> [Crozer] further objects to the request on the basis that it seeks confidential and proprietary information that is subject to legal prohibitions on disclosure. As [Crozer's attorney] explained to [the Union's attorney], the entire [APA] is the subject of a confidentiality agreement between [Crozer] and Prospect that [Crozer] is legally obliged to follow.

J.A. 73. Crozer's concern was thus a technical one. At no point did Crozer ever assert that certain parts of the APA were inherently sensitive. J.A. 14 (ALJ finding that Crozer "never identified portions of the APA [it] wanted to keep confidential from the Union").[16] At most it said that the APA was

---

[16] Crozer argues that it is "beyond dispute" that it "has a cognizable confidentiality interest in the kind of business and financial information contained in the Purchase Agreement." Crozer Br. 32. But nearly all the cases Crozer cites for that proposition have to do with relevance, not confidentiality. See, e.g., Teleprompter Corp. v. NLRB, 570 F.2d 4, 9 (1st Cir. 1977) ("Financial data need not be disclosed in the course of contract negotiations unless the bargaining representative first makes a showing that it is specially relevant to the bargaining taking place."). More to the point, Crozer, in all of its communications with the Union, never invoked "business and financial information contained in the Purchase Agreement" as

"confidential and proprietary," J.A. 69, but such a naked assertion of confidentiality is insufficient to meet Crozer's burden, J.A. 14 (ALJ noting that "the record contains no explanation why [Crozer] actually believed that certain portions of the APA were confidential or proprietary"). See Nat'l Steel Corp., 324 F.3d at 934.

We agree with the ALJ that the APA's confidentiality provision, on its own, did not suffice to create a legitimate and substantial confidentiality interest. A confidentiality agreement, like the one here, is ultimately just a contract. Any two parties can agree to keep certain matters secret, but that does not mean that those matters are inherently sensitive.[17] See Wash. Star Co., 273 N.L.R.B. 391, 397 (1984) (rejecting a confidentiality argument and holding that a selling employer's "obligation to provide the sales agreement [cannot] be defeated by a private agreement between [the employer] and [the buyer]"). Indeed, as Crozer itself acknowledges, confidentiality provisions in sales agreements are often just boilerplate. Crozer Br. 32. Crozer does not provide, nor can we locate, any authority permitting an employer to withhold relevant information from a union based solely on a contractual interest.[18] And that makes sense because allowing employers

_____

a basis for its asserted confidentiality interest. It always relied upon the confidentiality provision.

[17] The ALJ also read the confidentiality provision as permitting disclosures to the Union. We need not determine whether the ALJ's reading was correct, because the provision, even if it did bar disclosure, did not create a valid confidentiality interest.

[18] Crozer cites Northern Indiana Public Service Company, 347 N.L.R.B. 210, 212 (2006), where the Board

to withhold relevant information on such a basis would allow private parties to undermine the NLRA's statutory scheme. We therefore agree with the ALJ that Crozer's contractual interest here did not trump its statutory duty to furnish relevant information to the Union.

Because Crozer never established a legitimate and substantial confidentiality interest, it does not matter whether "Crozer was always willing to discuss and reasonably accommodate the Union's request." Crozer Br. 31; see Watkins Contracting, Inc., 335 N.L.R.B. 222, 226 (2001) (rejecting an employer's assertion of confidentiality where the employer "only stated that the information should be held confidential and then asked if the Union would agree to sign a confidentiality agreement"). Without a legitimate confidentiality interest, Crozer needed to provide all relevant information to the Union. See Howard Indus., Inc., 360 N.L.R.B. 891, 892 (2014) ("When a party is unable to establish confidentiality, no balancing of interests is required and it must disclose the information in full to the requesting party.").[19]

---

observed that "a promise of confidentiality is relevant to the issue of whether the information will be considered confidential." But in Northern Indiana, the Board found that "a legitimate and substantial confidentiality interest" existed beyond the promise of confidentiality itself. Id. at 211. That is not the case here.

[19] For this reason, Crozer's reliance on Good Life Beverage Co. (Silver Bros. Co.), 312 N.L.R.B. 1060 (1993), is misplaced. In that case, the union requested specific financial information that was undoubtedly confidential. Id. at 1061. And so the Board found that, given the "substantial and legitimate confidentiality concerns regarding [the requested]

In sum, substantial evidence supports the Board's conclusion that Crozer, in failing to provide the Union with requested, relevant information, violated the NLRA.

## C.

Crozer also challenges the Board's remedy. We conclude that the Board abused its discretion by issuing a punitive remedy.

The Board's remedial "power is a broad discretionary one, subject to limited judicial review." Fibreboard Paper Prods. Corp., 379 U.S. at 216. We accord "special respect" to the Board's remedy because "the Board draws on a fund of knowledge and expertise all its own." NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32 (1969). As the Supreme Court has instructed, "courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 899 (1984) (quoting Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194 (1941)). But at the same time, "the Board's discretion to select and fashion remedies for violations of the NLRA, though generally broad, is not unlimited." Hoffman

---

information," the employer had a right to discuss its confidentiality concerns with the union, and that the union failed to engage in accommodative bargaining. Id. at 1061–62. But Crozer, unlike the employer in Good Life Beverage, never established a "substantial and legitimate confidentiality" interest.

36

Plastic Compounds, Inc. v. NLRB, 535 U.S. 137, 142–43 (2002) (citations omitted).

One relevant limit is that "Board orders may not be punitive or confiscatory and must be reasonably adapted to the situation that calls for redress." Frito-Lay, Inc. v. NLRB, 585 F.2d 62, 68 (3d Cir. 1978) (quoting NLRB v. Townhouse T.V. & Appliances, Inc., 531 F.2d 826, 830 (7th Cir. 1976)). This is so because "[t]he function of the remedy in unfair labor cases is to restore the situation, as nearly as possible, to that which would have occurred but for the violation." Sys. Mgmt., Inc. v. NLRB, 901 F.2d 297, 308 (3d Cir. 1990) (quoting Kallmann v. NLRB, 640 F.2d 1094, 1103 (9th Cir. 1981)).

Here, the Board's order — directing Crozer to disclose the entire APA, with all schedules and attachments — was not "tailored to the unfair labor practice it [wa]s intended to redress." Sure-Tan, 467 U.S. at 900. As explained earlier, at least some of the APA is relevant, and Crozer's unsuccessful confidentiality claim is not an impediment to production of that relevant information. The ALJ was not specific, however, about which parts are relevant, perhaps because he ultimately ordered production of the entire APA. It may be that other parts of the APA (including schedules and attachments) are not relevant. And thus the Board, instead of restoring the situation to the status quo ante, placed the Union in a far more advantageous position vis-à-vis Crozer. That is punitive, not restorative.

We are unaware of any precedent for ordering an employer to furnish information to a union that has not been established as relevant. The cases relied upon by the Board hold that an employer that claims relevant information to be

37

confidential, yet never tries to substantiate or accommodate that claim, is not entitled to another round of bargaining and must produce that relevant information.  See, e.g., W. Penn Power Co., 339 N.L.R.B. 585, 586 (2003) ("Having violated the Act by refusing to provide relevant and necessary information, the Respondent is now obligated to produce the information.").  But those cases all involved information that had been established as relevant.  In none of them did the Board order an employer to provide information where relevance had not been established.

The Board majority, for its part, defended its remedy on the grounds that Crozer, by failing to "engage in accommodative bargaining at the time they first asserted a confidentiality interest," "unfairly imposed, and unjustly reaped the benefit of, an additional year of delay upon an uninformed bargaining partner."  J.A. 6.  But that reasoning conflates the analytically distinct issues of relevance and confidentiality.  Confidentiality is a defense that an employer may invoke in response to a union's request for relevant information.  Here, the Union never established the relevance of the entire APA, and thus Crozer cannot be faulted for failing to produce any irrelevant parts.

Again, we are mindful of the Board's broad discretion in crafting remedies for violations of the NLRA.  But "the rule of deference to the Board's choice of remedy does not constitute a blank check for arbitrary action."  Detroit Edison, 440 U.S. at 316.  The remedy for a failure to disclose relevant information is the disclosure of that relevant information, not the disclosure of other, irrelevant information.  In ordering disclosure of the entire APA, the Board abused its broad remedial discretion.

Before concluding, we observe that the only part of the APA that the Union has yet to receive is its schedules and attachments (aside from schedules 4.13(a) and 4.18(a)). Based on the list of schedules and attachments contained in the record, it may be that some of those schedules could be relevant, while others are not. We hold just that the Board abused its discretion in ordering Crozer to disclose <u>all</u> of the schedules and attachments to the Union. We leave it to the Board on remand to determine which schedules and attachments have been sufficiently established as relevant and thus which schedules and attachments the Union has a right to receive.

## IV.

For the foregoing reasons, we will grant Crozer's petition for review in part and deny it in part, grant the Board's cross-petition in part and deny it in part, and remand to the Board for further proceedings consistent with this opinion.

BIBAS, *Circuit Judge*, dissenting in part.

I join my colleagues in holding that Crozer did not show a confidentiality interest in the sale agreement. And I agree that the Board's remedy was punitive. So I too would grant Crozer's petition for review. But I write separately because I cannot join Part III.A of the majority's opinion.

Unions and employers must bargain in good faith. The employer here, Crozer, agreed to be bought by a third party, and the two signed an acquisition agreement. Soon after, Crozer told Union members about the upcoming sale and explained its effects, even though it had no duty to do so. The Union then asked to see the whole agreement. But the agreement's scope was broad. It orchestrated a multi-million-dollar sale, so it contained heaps of sensitive financial information not relevant to the Union. To be sure, some parts touched on topics near and dear to employees, like pensions and healthcare benefits. Recognizing this, Crozer repeatedly put these parts on the table, ready for the Union's taking.

The Union said no. From the very start, it wanted the whole agreement. But it never justified why the entire document, not just the parts affecting employees, was relevant. And despite Crozer's repeated offers to turn over these parts, the Union would not budge. It wanted all or nothing.

Nothing it got, and nothing it deserved. The Union did not satisfy its statutory duty to act in good faith. By contrast, Crozer consistently acted in good faith, so it did not violate the National Labor Relations Act. But in the face of the governing

1

statute and precedent, the majority holds otherwise. I respectfully disagree.

## I. THE UNION DID NOT JUSTIFY WHY IT NEEDED THE WHOLE AGREEMENT

The Act requires employers and unions "to bargain collectively" with each other. 29 U.S.C. § 158(a)(5), (b)(3). That duty, in turn, requires the two sides "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." § 158(d). These topics are "the subjects of mandatory bargaining." *NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 349 (1958).

These terse statutory commands have spawned many duties. One is relevant here: as part of its duty to confer in good faith, an employer must give unions the information they need to perform their duties properly. *N.J. Bell Tel. Co. v. NLRB*, 720 F.2d 789, 790–91 (3d Cir. 1983). That makes sense. Information asymmetries plague labor relations, and an employer could hurt unions by hoarding key information.

The Supreme Court has compared this duty to civil discovery, and it comes with similar triggers and limits. *See NLRB v. Acme Indus. Co.*, 385 U.S. 432, 437 (1967). To start, the union must make a request for information that is "specific" enough "to apprise the company of what information is sought." *NLRB v. N.J. Bell Tel. Co.*, 936 F.2d 144, 150 (3d Cir. 1991). And the request must include facts that "support[ ] an objective basis" for the union's concerns. *Hertz Corp. v. NLRB*, 105 F.3d 868, 874 (3d Cir. 1997). So a "union's bare assertion that it needs

2

information … does not automatically oblige the employer to supply all the information in the manner requested." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 314 (1979).

Or at least that is how it is supposed to work. It did not happen here. The Union never made a specific request for information grounded in the facts. As the majority recounts, Prospect agreed to buy Crozer in a multi-million-dollar deal. Their hundred-page-long contract covered everything from tax prorations to antitrust compliance. That contract also came with seventy-seven exhibits and schedules. Taken together, these documents touched on Crozer's most sensitive information. Here is a sample:

- Crozer's intellectual property;

- The condition of all Crozer assets and any material defects;

- Any insurance policies on those assets and the details of those policies;

- Any significant contracts to which Crozer was a party;

- Any investigations into Crozer that were pending or threatened; and

- Any litigation or proceedings involving Crozer.

To be sure, the agreement also touched on topics that matter to the Union's members, like employee benefits.

Soon after entering the contract, Crozer told the Union of the sale and reassured it that many key employment terms

would stay the same. The Union then asked for "the complete Asset Purchase Agreement and all attachments and schedule[s] of the agreement." App. 67. But it never explained *why* it needed the whole agreement. Crozer responded that the whole agreement was not relevant to bargaining and that it would consider alternative requests. The Union stuck to its guns, again asking for the whole agreement "with attachments and schedules." App. 70. Again, it offered no explanation.

The Union did not have to say much. It could have asked for all contractual terms affecting mandatory-bargaining subjects like wages or benefits. That information is presumptively relevant. Or it could have asked Crozer to prove every claim it made about the sale, from the transaction's effect on hospital closings to its treatment of pensions. *See Int'l Tel. & Tel. Corp. v. NLRB*, 382 F.2d 366, 371 (3d Cir. 1967). Or it could have thrown a Hail Mary and tried to justify why it needed the whole agreement. But it did none of that.

Instead, the Union simply asserted that it needed the whole agreement "for effects bargaining." App. 67. In other words, the Union needed the agreement because it was relevant, and it was relevant because the Union needed it. That circularity does not satisfy the Union's burden. The Union puts forth all sorts of justifications now, but we cannot consider them. *Hertz*, 105 F.3d at 873–74. So we are left with no justification at all.

The whole agreement was not relevant; the majority does not contest that. *See* Maj. Op. 16–17. But, as the majority correctly notes, the agreement contained *some* relevant information. Maj. Op. 17. According to the majority, Crozer had to

4

give the Union those relevant parts of the agreement. The Union, however, did not ask for that particular information; it asked for the whole agreement. And the Union's burden is to justify its request then and there, not to make an overbroad, boilerplate request and hope that a court will later find some subset relevant. By cabining its inquiry, the majority lets the Union off the hook.

## II. THE UNION CANNOT RELY ON PRESUMPTIONS OR CONTEXT

Finding no help in the general standard, the Union seeks refuge elsewhere in our law. First, it tries to escape its burden through a limited exception. Second, it claims that the context made an explanation unnecessary. Neither argument works.

To start, the Union claims that the whole agreement was presumptively relevant. "[*W*]*age and related information* pertaining to employees in the bargaining unit is *presumptively* relevant." *Curtiss-Wright Corp., Wright Aeronautical Div. v. NLRB*, 347 F.2d 61, 69 (3d Cir. 1965). A union need not "show [its] precise relevance." *Id.* But the presumption applies only to information about "the core of the employer-employee relationship"—that is, mandatory-bargaining subjects. *Id.* While parts of the agreement touched that core, the Union's blanket request went well beyond it. The Union swung for the fences, but it missed. So it gets no help here.

The Union's context argument also fails. Take a step back: When Crozer first told the Union of its upcoming sale, it reassured Union members that "many things at Crozer-Keystone

5

[would] *not* change." App. 59. Hospitals would stay open, unionized employees could keep working, and key services would remain or grow. Crozer also preemptively answered more than thirty questions, including how the sale would change pensions and healthcare benefits. All in all, it gave Union members eight pages of detailed information about how the sale would affect them.

Nothing forced Crozer to give out this information up front. It was an olive branch. But because of that good-faith gesture, the Union says, Crozer made the whole agreement relevant and had to turn it all over. There are indeed times when the context of a request makes any further justification unnecessary. In that situation, the employer must disclose—no questions asked. *See Hertz*, 105 F.3d at 874.

This is not one of those times. At most, the context here made relevant only those provisions that touched on employee-related issues. If the Union had asked for only those provisions, it might have been entitled to them without further explanation. But the Union asked for the whole contract, not just for those provisions. So it cannot benefit from this exception, and Crozer's good deed should go unpunished.

In holding that the context here required disclosure, the majority emphasizes Crozer's letter to the Union about the Prospect sale. Maj. Op. 23–25. So I worry that the majority's holding will perversely discourage employers from giving employees extra information at the outset. That sort of disclosure benefits unions and their members, but employers may no longer be so forthcoming. If Crozer had said nothing, this appeal might have come out the other way. The takeaway for future

employers is as clear as it is troubling: choose silence over transparency.

## III. THE UNION'S BROAD REQUEST DID NOT REQUIRE CROZER TO TURN OVER SPECIFIC PARTS OF THE AGREEMENT

So the Union keeps looking for shelter. Its next argument goes like this: even though the whole agreement was not relevant, some parts were, and Crozer's blanket request for the whole agreement required Crozer to turn over those relevant parts. In other words, employers facing overbroad requests must ferret through their haystacks and turn over any needles that they find. The majority buys that argument and crafts an even more troubling rule. But the authority for these rules is shaky. Crozer kept offering to turn over the relevant parts. The Union rejected those offers and should reap no reward for its stubbornness.

### A. Beware the Union's rule

I turn first to the Act. That is not where the Board starts. After decades of agency precedents, the Board has lost sight of its foundational grant of authority from Congress. A reminder: the Act requires employers to "meet [with employee representatives] at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The statute says nothing about information requests, let alone overbreadth.

So we turn to the agency's interpretations of the Act, to which we owe deference. The administrative law judge here pointed to one: "an employer may not simply refuse to comply

7

with an ambiguous or overbroad information request, but must request clarification and/or comply with the request to the extent it encompasses necessary and relevant information." App. 13 (quoting agency decisions). The Union asks us to adopt that rule as our own.

But this rule has a few problems. First, it is a bright-line rule. A categorical approach to the statute strays from what the Supreme Court has told us should be a fact-bound, case-by-case inquiry. *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153–54 (1956). Though the statutory requirement of good faith is amorphous, it at least requires the Board to analyze the facts of each case. Faced with a conflict between the Board and the Supreme Court, we should follow the Court's lead.

Second, the rule could let unions make overbroad requests and leave it to the employer to winnow the wheat from the chaff. What is to stop a union from asking every month for all available information, and leaving it to the employer to turn over anything relevant? On the Board's view, perhaps nothing at all. Not only would that undercut the case-by-case inquiry into good faith, but it would flip the burden from the union to the employer.

## B. Even if an overbroad request is okay, Crozer complied with the Board's rule

But assume that the Board has it right, and even an overbroad request calls for "clarification and/or" partial compliance. *Keauhou Beach Hotel*, 298 N.L.R.B. 702, 702 (1990); *see also Norris, a Dover Res. Co. v. NLRB*, 417 F.3d 1161, 1171 (10th Cir. 2005) (enforcing this rule). This rule is disjunctive, so employers can comply by *either* clarifying *or* complying. Crozer did both.

To start, Crozer did ask the Union to clarify its request. After the overbroad request, Crozer told the Union that "the entire APA is not relevant for effects bargaining over the terms and conditions of employment of bargaining unit members." App. 69. Then it said that it was "open to considering any alternative requests [the Union] may have." *Id.* By explaining that the request was overbroad and asking the Union to make an alternative, narrower request, Crozer met its duty to follow up. But the Union did not clarify, narrow, or justify its request. Instead, it again asked for the whole agreement.

Crozer also offered to give the Union the relevant parts of the agreement. In a letter to the Union, Crozer said that its lawyer had "offered to discuss with [the Union] the potential for production of those portions of the Asset Purchase Agreement and any attachments and schedules thereto that relate to or affect [Crozer] employees, including those who are members of [the Union]." App. 72. And the letter renewed that offer.

Two Union employees also testified that Crozer made the same offer orally. A Union representative said that Crozer's

lead negotiator had "offered up the relevant portions of the" sale agreement. App. 206. And the Union's executive director confirmed that Crozer's lead negotiator "may have also said that they would be willing to determine what was relevant and share that with the Union." App. 253. The executive director agreed that Crozer specifically discussed "produc[ing] the portions relevant to employees." App. 266.

Despite Crozer's oral and written offers to produce the relevant parts of the agreement, the majority claims that Crozer "refused to provide any" part of the agreement. Maj. Op. 3. But Crozer made exactly the offer that the majority says it did not. So it satisfied both parts of the Board's overbreadth rule.

### C.  Fear the majority's rule

The majority casts aside the Board's overbreadth rule and crafts its own: An employer, faced with an overbroad information request, must somehow identify and produce the relevant parts. Then, for any parts not produced, the employer must explain why it withheld those parts. Maj. Op. 30.

The Board did not ask for this rule. Nor did the Union. So where does the majority get it? It imports it wholesale from the Federal Rules of Civil Procedure. Maj. Op. 27–30. Now, the Supreme Court has compared the information-exchange process to federal civil discovery, calling it a "discovery-type standard." *Acme Indus.*, 385 U.S. at 437. We have recognized this analogy before. *N.J. Bell Tel. Co.*, 936 F.2d at 150. But that is as far as the Supreme Court has gone—an analogy. It has never found that the Federal Rules of Civil Procedure gov-

ern. And for good reason: we must assess the exchange of information case by case. As the Supreme Court has repeatedly emphasized, "[e]ach case must turn upon its particular facts." *Truitt Mfg. Co.*, 351 U.S. at 153. This is true of both the employer's duty to disclose and "the type of disclosure that will satisfy that duty." *Detroit Edison Co.*, 440 U.S. at 314–15. In short, whether an employer acted in good faith is fact-specific. Yet the majority borrows a categorical rule.

That rule is not only categorical, but also unworkable. Like the Board's rule, it licenses fishing expeditions. Unions no longer need justify their requests, but can just ask for monthly data dumps. And it discourages bargaining in good faith. Here, the Union submitted a bare-bones request; it demanded the whole Agreement and refused to say which parts it thought relevant. Under the majority's rule, Crozer had to pore over it all, including its many exhibits and schedules, and guess what information would be relevant. Crozer then had to give the Union those parts of the agreement, even though the Union had repeatedly rejected Crozer's offers to do just that. So Crozer is punished for failing to give the Union the parts it had rejected. So much for good faith.

## IV. THE UNION DID NOT ACT IN GOOD FAITH

It bears repeating: The Act requires both employers and Union representatives to "confer in good faith." 29 U.S.C. § 158(d). In failure-to-disclose cases, "[t]he inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *Truitt Mfg. Co.*, 351 U.S. at 153–54.

11

This case showcases the risks of departing from that case-by-case inquiry. The Union repeatedly did not act in good faith. It refused to accept the information that it now seeks. It repeatedly rebuffed Crozer's offers to turn over the agreement's relevant parts. And it had no good reason for doing so. The Union knew the agreement contained irrelevant information. For instance, it knew that the contract affected Crozer locations where no Union employees worked. Yet the Union made its overbroad request anyway. It later admitted its real motivation: it wanted a peek at Crozer's finances, not just at employment-related terms.

This lack of good faith should be central to our analysis. The majority's presumptions and categorical rules obscure these damning facts. But the Supreme Court mandates a case-by-case approach, and we should apply it. Doing so makes clear that this Union did not act in good faith. It should not now reap the Act's benefits.

\* \* \* \* \*

This circuit rarely opines on the Board's interpretations of labor law. When we do, we must pay special care to the rules we approve and pronounce. Today, this Court faults an employer for sharing, in good faith, information about an upcoming sale. It flips the burden from unions to employers to decide what is relevant, upending a decades-old scheme by analogizing too literally to civil discovery. It blesses agency actions that are unmoored from the governing statute. And it overlooks key facts in the record. So I respectfully dissent from Part III.A of the majority's decision, but join the rest.